# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2512

SUNDAR R. KRISHNAPILLAI,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A99-027-190

ARGUED JUNE 2, 2008—DECIDED APRIL 23, 2009

Before EASTERBROOK, *Chief Judge*, and ROVNER and
WOOD, *Circuit Judges*.

ROVNER, *Circuit Judge*. Sundar R. Krishnapillai
("Sundararajan")[1], a native and citizen of Sri Lanka,
petitions for review of an order of the Board of Immigra-

---

[1] Sri Lankan and Tamil naming conventions differ from our
own. We refer to the petitioner by the name set forth in the
narrative statement he submitted in support of his asylum
application. A.R. 394.

tion Appeals (the "BIA" or "Board") sustaining the denial of his requests for asylum, restriction on removal, and relief under the United Nations Convention Against Torture. Based on his own experiences in Sri Lanka and on the adverse treatment of other ethnic Tamils like himself, Sundararajan contends that he faces likely persecution at the hands of both the Sri Lankan authorities and terrorist insurgents if he is forcibly returned. However, the Immigration Judge found Sundararajan's testimony regarding his own experiences to be incredible and denied his claims based largely on the adverse credibility finding, and the Board affirmed that decision. Because the IJ's decision, as supplemented by the Board, is supported by substantial evidence and is not tainted by any legal error, we deny Sundararajan's petition for review.

## I.

Sundararajan's requests for relief are founded on a belief that he is at risk of harm from both the armed forces of the Sri Lankan government and the Liberation Tigers of Tamil Eelam ("LTTE"), a terrorist organization based in northern Sri Lanka that for more than thirty years has been waging a violent campaign to create an independent state for Sri Lanka's Tamil minority. Sundararajan, himself an ethnic Tamil, gave the following account of the events that brought him to the United States in his testimony and in the narrative statement attached to his asylum application.

Sundararajan was born in 1969 in Navatkuda, a town in the Batticaloa district in eastern Sri Lanka. He has worked both as a self-employed farmer and heavy truck driver. He married in 1994 and now has three children, aged five through thirteen. His wife and children remain in Sri Lanka.

In 1990 or 1991, Sundararajan and his family lost their home and most of their belongings in the midst of heavy fighting between the LTTE and the Sri Lankan army. For a time, they lived in a refugee camp in nearby Vantharumoolai, but their fear of random arrests and detention by the Sri Lankan army eventually led them to depart for the coastline village of Navalady. The devastating tsunami of December 2004 took the life of Sundararajan's brother and destroyed the hut his family was living in, along with what few possessions they had left.

In the wake of the tsunami, Sundararajan and his family (including his parents) left the coastal region and eventually relocated inland to an area then controlled by the LTTE. For a year, they lived there in peace. But then fighting broke out between the LTTE and the Sri Lankan military, people living in the area became subject to arrest and torture by the army, and the government imposed an economic embargo on this and other areas controlled by the LTTE. To help maintain its control of the area, the LTTE organized a compulsory "self-defense" training program, in which at least one member of each family was expected to participate. Sundararajan testified that he was contacted on multiple occasions about

taking the training and at first demurred. Eventually, he felt that he had no alternative but to agree. After telling the LTTE that he would participate in the training, he advised his parents and his wife to move to an army-controlled area and told them that he would join them when he escaped from the LTTE. On the following day, a date in April 2006, the LTTE picked him up and took him to a training camp at Kokati Cholai, a rural area. The camp was surrounded by a fence and patrolled by armed guards. Sundararajan testified that after spending two days in the camp, he managed to get away at four o'clock in the morning by telling the guards (one of whom he knew) that he was going out to buy cigarettes at a nearby shop that opened at that early hour. He left the LTTE-controlled area and joined his family in Arasady, a government-controlled zone, where a priest gave them shelter in a church. He spent one or two months there. But the LTTE came looking for him, and Sundararajan's wife was warned that he would be killed if he did not report back to an LTTE political office.

With his wife and parents urging him to flee Sri Lanka for his own safety, Sundararajan re-located by himself to Colombo, on the west coast of the country. There he stayed in a private lodge for nearly a month, until he was arrested in a round-up by Sri Lankan police. Despite his protestations to the contrary, he was accused by the authorities of being an LTTE member and was beaten into unconsciousness. After seven or eight days in police custody, he was finally released when his wife arrived with documents showing that he was married

with three children and convinced the police that he was not an LTTE member.

Seeing the arrests and abuse that other young Tamils like himself were experiencing in Colombo, Sundararajan decided that he could not remain there. A friend arranged temporary employment for him in Singapore, and he left Sri Lanka on September 28, 2006. But on arrival in Singapore, he discovered that he could remain for no longer than two weeks. Sundararajan met with an "agent," who in exchange for $3,000 provided him with a forged passport and made arrangements for him to travel to Canada via the United States. He was told that if he was stopped by Immigration officials in the U.S., he could always ask for asylum.

Sundararajan flew to the United States via Seoul, South Korea on a forged Singaporean passport. He arrived in this country on October 11, 2006. In response to questioning by customs officials, Sundararajan said that he was a tourist on his way to Canada. But when officials determined that his passport was fraudulent, Sundararajan admitted that he was fleeing Sri Lanka and had purchased the false passport for $3,000. He was refused admission into the United States and was taken into custody. He subsequently obtained counsel and filed a Form I-589 application for relief in the form of asylum, *see* 8 U.S.C. § 1158, restriction on removal, 8 U.S.C. § 1231(b)(3)(A), and withholding of removal pursuant to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 23 I.L.M. 1027 (1984) ("CAT"). His application was referred to an Immigration

Judge ("IJ"), who conducted an evidentiary hearing in January 2007. Sundararajan was the sole witness at that hearing.

In addition to his testimony before the IJ, Sundararajan offered several documents to show that he and his family had been the targets of abuse in Sri Lanka. These materials were sent to the United States by Sundararajan's wife, who was contacted by Sundararajan's cousin at the behest of his counsel. Not included among the documents was any statement from Sundararajan's wife, although she had been a witness to some of the events described in his asylum application and testimony, including his forced enrollment in LTTE training and his detention in Colombo. When questioned on this point by the IJ, Sundararajan would testify that he was not in regular contact with his wife, and although he knew her whereabouts in Sri Lanka, it would take at least fifteen days for a letter to reach her.

The documents forwarded by Sundararajan's wife included the following. A translated extract from the "information book" of a police station in Sri Lanka describes a complaint that his wife filed with the police following his departure from Sri Lanka. Sundararajan's wife alleged that people had come to her residence looking for her husband in previous weeks. In one instance, some men came to the residence at ten o'clock in the evening, woke everyone up, demanded to know her husband's whereabouts, threatened her, and then left. She had also received telephone calls threatening the lives of herself and her family members. Her husband, she

said, had left the country due to the same type of harass-
ment she and her children were experiencing. "[W]e live
with fear and insecurity," she stated. A.R. 235. Also
submitted was a receipt indicating that a "Complaint of
Threat" had been filed with the Human Rights Com-
mission of Sri Lanka at its regional office in Batticaloa. A.R.
244. We are told that the complaint was filed on
Sundararajan's behalf; however, the receipt does not
reveal the content of the complaint. Finally, there is a
translated letter dated November 30, 2006, from the
Reverend Father Jeremiah S. Arasarathinam, the director
of a home for senior citizens in Batticaloa. He indicates
that Sundararajan's wife and three children had "under-
gone tremendous difficulties during the past few years
under the hands of an unknown armed group." A.R. 245.
Their house had been damaged, they had moved their
residence due to threats, and they had spent the last
three months at the senior citizens' residence "as refugees."
A.R. 245. "Due to death threats given by some unknown
group to Mr. Sunthararajah [sic], he fled the country due
to fear about 4 months ago and I [have] come to under-
stand that he is presently in America." A.R. 245.

Also in the record is the December 2006 report of the
United Nations Office of the High Commissioner for
Refugees ("UNHCR") regarding asylum-seekers from
Sri Lanka. A.R. 249. The report notes a general deteriora-
tion in the security situation in Sri Lanka during the
preceding year due to an uprising within the LTTE and an
escalation in violence between the LTTE and the Sri
Lankan armed forces, with predictable consequences
for the civilians who are increasingly being drawn into

the conflict. The report also describes in some detail the Catch-22 in which ethnic Tamils find themselves.

> In addition to the situation of widespread insecurity and the impact of the armed conflict in the North and East, Tamils in and from these regions are at risk of targeted violations of their human rights from all parties to the armed conflict. Harassment, intimidation, arrest, detention, torture, abduction and killing at the hands of government forces, the LTTE and para- military or armed groups are frequently reported to be inflicted on Tamils from the North and East.

A.R. 253. Those suspected of LTTE affiliation are at risk of abuse by either the authorities or government-sponsored paramilitary groups. A.R. 253-54. On the other hand, they may be targeted for abuse by the LTTE if they do not lend their support to the insurgents: The LTTE has been impli- cated in some 200 targeted killings, mostly of Tamils suspected of opposing the LTTE. A.R. 254. The report also notes the difficulties faced by Tamils in and from Colombo. In addition to being at heightened risk for security checks and the like by the authorities, "Tamils in Colombo are especially vulnerable to abductions, disap- pearances, and killings." A.R. 257. The report characterizes the overall situation in Sri Lanka "as one of generalized violence and events seriously disturbing public order." A.R. 260. For those citizens who have been singled out for abuse by the LTTE, the report paints a grim picture. "[T]here is no realistic flight alternative given the reach of the LTTE and the inability of the authorities to pro- vide assured protection." A.R. 261. The point is made

more emphatically with respect to Tamils who, like Sundararajan, hail from the North and East of Sri Lanka:

> In relation to Tamils from the North or East fleeing generalized violence, there is no internal flight alternative within the North or East given the situation of armed conflict. Nor would it be possible and/or safe to travel to other areas in light of the closure of the A9 highway to civilians, lack of other travel routes, and the risks entailed in traveling out of the North and East. Tamils who are able to reach Colombo could be vulnerable to arbitrary arrests, detention and other forms of human rights abuses Tamils have faced there. It may be noted that Tamils originating from the North and East, in particular from LTTE-controlled areas, are perceived by the authorities as potential LTTE members or supporters, and are more likely to be subject to arrests, detention, abduction and even killings. . . .

A.R. 261 (footnote omitted). The report thus recommends that "[n]o Tamil from the North or East should be returned forcibly until there is significant improvement in the security situation in Sri Lanka." A.R. 261. It makes the same recommendation for Tamils from Colombo. A.R. 262.

The U.S. State Department's 2005 Country Report on Human Rights Practices in Sri Lanka, A.R. 292, makes some of the same observations as the UNHCR report, without reaching the conclusion that Tamils should not be returned involuntarily to the country. It acknowledges that the LTTE has engaged in "targeted killings, kidnap-

ping, hijackings of truck shipments, and forcible recruit-
ment, including of children." A.R. 297. The report also
acknowledges the abuses that occur on the part of the
authorities, including arbitrary arrests and detentions
(most often of Tamils) and the "endemic " use of torture
to extract confessions. A.R. 294. "Impunity, particularly
for cases of police torture, was a severe problem," in 2005.
A.R. 295. Although in far less detail and degree, the
Country Report does acknowledge the particular hard-
ships faced by ethnic Tamils. It indicates of the 339,000
internally displaced persons in Sri Lanka, some 50,000 of
them (primarily Tamils) are unable to resettle due to
ongoing conflict between the LTTE and the government
and the high-security zones associated with that conflict.
A.R. 300.

Various and sundry newspaper articles, communiqués
from human rights organizations, and internet postings
submitted by Sundararajan make similar points.

The adverse conditions these documents describe for
the citizens of Sri Lanka, and for Tamils in particular, are
consistent with the experiences that Sundararajan re-
counted in his asylum application and in his testimony
before the IJ.

But, after hearing Sundararajan's testimony and consid-
ering the other evidence he submitted, Immigration
Judge Gabriel Videla denied his application for asylum
and other relief in a cogent decision. A.R. 56. "[T]he most
troubling point in this case is the respondent's credibility
and I have tried very hard to overlook the credibility
problems present in this case and unfortunately I

cannot do so." A.R. 74. The IJ noted inconsistencies in Sundararajan's testimony as to the timing of two key events, both of which had occurred within one year of the January 2007 hearing. First, Sundararajan had wavered as to whether he was picked up and taken to the LTTE camp for training in March or April 2006. A.R. 76. And second, Sundararajan testified that he was arrested by the police in Colombo on August 28, 2006, but that date was off by several months from the date of May 20, 2006, that the IJ derived from the chronology of events (from Sundararajan's internment and escape from the LTTE camp, to his brief reunification with his family, and then his relocation to Colombo) that Sundararajan had set forth at the hearing. A.R. 76-77. The inconsistency as to the date of his arrest struck the IJ as particularly significant. "Now I can understand a discrepancy of a day or two, or even a month, but this is a serious discrepancy because it is over three months and, when the respondent was confronted with this, he really never came up with a responsive answer and, to me, this individual testifying before the Court does not appear to be testifying from actual experience." A.R. 77. Judge Videla also found Sundararajan's testimony that he had escaped from the LTTE camp by telling the guards that he was going out to buy cigarettes implausible.

> If these individuals were so intent in coming after the respondent that they made not one contact or two contacts, but three contacts, and they forcefully took him away with armed individuals and they put him in a camp surrounded by a fence and patrolled by their people who had weapons, I very respectfully

> find it difficult to believe that the respondent would just be allowed to go buy cigarettes through the front gate at 4:00 a.m. in the morning and simply never go back. It does not make sense.

A.R. 78. Finally, the IJ noted the inconsistency between Sundararajan's testimony that he left Sri Lanka on September 28, 2006, and the asylum application which his attorney had prepared and that he had reviewed and signed, which repeatedly indicated that he departed Sri Lanka on July 19, 2006. A.R. 79. He rejected the possibility that the date on the application was a mistake, as Sundararajan's attorney suggested. A.R. 79-80. Based on these inconsistencies, the IJ concluded that Sundararajan was not a credible witness. A.R. 74.

Given Sundararajan's lack of credibility as a witness, the IJ found it reasonable to expect that he would present additional evidence to corroborate his account, including for example a letter from his wife, who according to his testimony was a witness to some of the events he had described. A.R. 80-81. But he had not done so, although such evidence was reasonably available to him. Sundararajan had, for example, mentioned a letter he had received from someone in New York describing the difficulties his wife was experiencing in Sri Lanka. Yet Sundararajan had inexplicably thrown the letter away despite the fact that his asylum application was pending and he understood the need for documents supporting his claims. A.R. 80-81.

Notwithstanding the lack of credible evidence that Sundararajan had experienced past persecution in Sri

Lanka, the IJ went on to consider the possibility that he might be persecuted upon his return to that country given his Tamil ethnicity. The IJ acknowledged that the situation for Tamils in Sri Lanka is "quite dire," but without additional evidence suggesting that Sundararajan in particular would be singled out, the judge was unwilling to assume based on Sundararajan's ethnicity alone that he was likely to be persecuted. A.R. 82. Although the background evidence of human rights violations and torture in Sri Lanka was "quite significant," the Judge did not find it sufficient to establish a pattern and practice of persecuting Tamils in Sri Lanka that would relieve Sundararajan of presenting proof that he in particular would face such abuses upon return to his homeland. A.R. 82-83.

Judge Videla concluded for these reasons that Sundararajan had not proven that he had a well-founded fear of persecution in Sri Lanka such that he was eligible for asylum. A.R. 83. Because his claim for restriction on removal was subject to a higher burden of proof, it followed that he had not established his eligibility for that relief either. A.R. 83. And because the judge had found Sundararajan's testimony lacking in credibility, his request for relief under the CAT also failed. A.R. 83-84. Specifically, Sundararajan had not shown that he was likely to be arrested upon his return to Sri Lanka and that, if he were arrested, he would be physically mistreated. A.R. 84.

The BIA sustained the IJ's adverse credibility determination. A.R. 2. The Board agreed with Sundararajan that his inconsistent testimony as to whether the LTTE took

him to the training camp in March or April of 2006 was a minor inconsistency, most likely a slip of the tongue which, prior to enactment of the REAL ID Act of 2005, P.L. 109-13, 119 Stat. 231, 302, would not have justified an adverse credibility finding. A.R. 4. "Even under the new legislation, we cannot find that the applicant's 'slip' is sufficient to doubt his entire claim, although it could, in viewing the totality of the circumstances, provide additional evidence for an adverse credibility finding." A.R. 4. But the Board believed that the IJ was fully justified in citing the discrepancy in Sundararajan's testimony as to the date of his arrest in Colombo as a reason to doubt his credibility. The Board rejected Sundararajan's contention that the IJ, in reasoning that he should be able to accurately recall the date of so traumatic episode as his arrest and subsequent detention, was simply speculating as to the traumatic nature of that event. "The very fact that the applicant relies on this incident to support his claim of fear from governmental forces in Sri Lanka is sufficient to conclude that it was a traumatic event for him, leading in part to his departure." A.R. 4. The Board similarly rejected Sundararajan's contention that the IJ was speculating when he found the account of his escape from the LTTE camp implausible. "It is not merely speculative to say that the applicant's claim of being forcefully removed from his home and forced to remain in a camp run by the LTTE is at odds with his statement that he 'escaped' when allowed to go to the store to buy cigarettes." A.R. 4-5. Finally, the Board concluded that Sundararajan had not adequately explained the discrepancy between his testimony and his asylum application

as to when it was that he left Sri Lanka. A.R. 5. "All of these inconsistencies taken together are sufficient to support the Immigration Judge's adverse credibility finding." A.R. 5.

The Board went on to sustain the IJ's demand for evidence to corroborate Sundararajan's account as well as his conclusion that Sundararajan had failed to present adequate corroboration. In the Board's view, the IJ had considered what evidence Sundararajan had tendered, but found it inadequate to substantiate his story. In particular, the Board noted that the background evidence of the civil strife and human rights abuses to which Sundararajan pointed, although it was "important generalized evidence" of the types of abuses occurring in Sri Lanka, was not "sufficient to rehabilitate his suspect credibility about [his own] past personal experiences." A.R. 5. The Board thus sustained the IJ's conclusion that Sundararajan failed to prove he was the victim of past persecution.

The Board also rejected Sundararajan's contention that, regardless of his own experience in Sri Lanka, he was entitled to relief in view of a pattern or practice of persecution of Tamils in Sri Lanka. The Board acknowledged the ongoing civil strife between the LTTE and Sri Lankan armed forces and recognized that "human rights violations do occur on a large scale in Sri Lanka," but it found the evidence of those abuses insufficient to establish a "pattern or practice" of persecution on the basis of race, ethnicity, or another protected ground. A.R. 6. It also found the evidence insufficient to establish a likeli-

hood that Sundararajan would be tortured if returned to Sri Lanka. A.R. 6.

Finally, the BIA rejected Sundararajan's contention that a remand was necessary because the IJ had neglected to adjudicate the additional claim that he would face harm in Sri Lanka as a failed asylum-seeker. A.R. 5 n.1. The Board found no error in the IJ's omission to address this claim specifically, even assuming that failed asylum seekers are a social group who could be said to share an immutable characteristic, such that they could claim a right to asylum. The Board saw this claim as dependent on Sundararajan's credibility, and "[w]e affirm the Immigration Judge's adverse credibility determination." A.R. 5 n.1.

## II.

We review the IJ's decision as supplemented by the Board's own analysis. *E.g.*, *Bakarian v. Mukasey*, 541 F.3d 775, 781 (7th Cir. 2008). We examine the IJ's factual determinations deferentially and will uphold them so long as they have the support of substantial evidence. *E.g.*, *Ingmantoro v. Mukasey*, 550 F.3d 646, 649 (7th Cir. 2008). At the core of both the IJ's decision and the Board's order upholding it was the determination that Sundararajan had failed to show that he has a well-founded fear that he will be persecuted if returned to Sri Lanka. We will disturb that determination only if the evidence of likely persecution was "'so compelling that no reasonable factfinder could fail to find the requisite degree of persecution.'" *Chatta v. Mukasey*, 523 F.3d 748, 752 (7th Cir.

2008) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 484, 112 S. Ct. 812, 817 (1992)).

A. Adverse credibility determination

As was true before the BIA, Sundararajan's first challenge is to the IJ's determination that his testimony was not credible. He contends, contrary to the Board's decision, that the adverse credibility determination was unfounded, and in support of that contention he cites three aspects of the reasoning employed by the IJ and/or the Board that he believes were flawed. First, the Board represented that he contradicted himself as to the date of his arrest in Colombo: "he originally alleged that he was arrested in May of 2006, but later testified the arrest occurred on August 25, 2006." A.R. 4. In fact, Sundararajan points out, he never cited May as the month of his arrest, only August. He adds that the UNHCR report supports his testimony that his arrest would have taken place in August.[2] Second, he contends that the IJ, in discounting as implausible his account of escaping from

---

[2] Sundararajan also faults the Board for characterizing his arrest in Colombo as a traumatic event whose date he should be able to recall correctly, when it was his forced enrollment in the LTTE training camp that the IJ cited as a traumatic event. It is true that the IJ questioned Sundararajan about the traumatic nature of being taken involuntarily for training, A.R. 192, and cited that event as a traumatic one in his decision, A.R. 76. But the IJ elsewhere referred to both events as traumatic, A.R. 75, and as the Board itself pointed out, the fact that Sundararajan cited his arrest as a basis for his fear of persecution speaks to the traumatic nature of that event. A.R. 4.

the LTTE camp, mischaracterized his testimony and assumed facts that were not borne out by the record. In particular, the IJ assumed that he had been taken forcibly to the camp and that the camp was secure, such that he would not have been permitted to simply walk out of the camp in order to buy cigarettes. In reality, Sundararajan represents, he never testified that he was taken to the camp by force, and although the camp was both fenced and patrolled, he testified that people were free to come and go from the camp. Third, although he acknowledges the discrepancy between his testimony and his asylum application as to the date of his departure from Sri Lanka, he insists that the discrepancy was adequately explained. He testified that he was in custody when his attorney prepared the application and consequently was only able to consult with his counsel over the telephone, thus suggesting that the mistake was simply the result of miscommunication or oversight rather than prevarication.[3]

The INA, as amended by the REAL ID Act of 2005, sets forth the parameters for the Immigration Judge's credibility determinations:

---

[3] Sundararajan adds that in the statement attached to his asylum application, he stated that he was in Singapore for fourteen days, which tallies with his testimony that he left Sri Lanka on September 28, 2006 and arrived in the United States on October 11. That is true as far as it goes. But it does not resolve the patent inconsistency between his asylum application and his testimony as to the date of his departure from Sri Lanka.

Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. . . .

8 U.S.C. § 1158(b)(1)(B)(iii). As the terms of the statute make clear, the IJ is no longer required to link inconsistencies, inaccuracies, and falsehoods in a witness's testimony to the heart of the immigrant's claim before relying on those defects as a reason to discredit a witness's testimony. *Mitondo v. Mukasey*, 523 F.3d 784, 787-88 (7th Cir. 2008). The IJ does remain obliged to distinguish between inconsistencies and the like that are material and those that are not. *Kadia v. Gonzales*, 501 F.3d 817, 822 (7th Cir. 2007). Obviously, the IJ, having heard the testimony first hand, is far better situated to assess the credibility of a witness than we are. *Garcia v. INS*, 31 F.3d 441, 444 (7th Cir. 1994) (quoting *Estrada v. INS*, 775 F.2d 1018, 1021 (9th Cir. 1985)). Only in extraordinary circumstances will we upset his credibility assessment. *E.g.*, *Musollari v. Mukasey*, 545 F.3d 505, 508 (7th Cir. 2008).

Having reviewed the decisions of the IJ and the Board along with the evidentiary record, we discern no basis on which to disturb the IJ's decision not to credit Sundararajan's testimony. To begin, there was an inconsistency in his testimony as to whether his arrest in Colombo occurred in May or August 2006. It is true that Sundararajan never mentioned May 2006 as the date of his arrest, as the Board suggested. A.R. 4. It was, instead, the IJ who derived that date from the sequence of events to which Sundararajan had testified. But the IJ's inference in that regard was nonetheless grounded in Sundararajan's testimony, and the IJ explicitly set forth the bases for inferring that Sundararajan had been arrested in May. A.R. 76-77. Sundararajan has not shown that the IJ's calculation of the May date was off-base, and we find that it is consistent with the chronology to which Sundararajan testified. So when Sundararajan testified that he was arrested in August, rather than May, he implicitly contradicted the chronology he had already set forth in his testimony. The UNHCR report is of no help to Sundararajan in explaining the discrepancy: The report simply confirms that Tamils were at heightened risk of security checks, arbitrary searches, harassment, and the like as the result of new governmental regulations imposed in April and December 2006. A.R. 257. The report supports the notion that Sundararajan could have been arrested within the April to December time period, but it does not point to either May or August as the likely date. We also note that Sundararajan confessed to confusion and an inability to recall the date of his arrest and the chronology of events leading up to it with specificity

when pressed on this point by the IJ. A.R. 199 ("Because of the tension I couldn't remember it properly. . . . Actually, I can't calculate the months because I was—I wasn't thinking clearly. I can't remember the months."). However, his confusion, although understandable, does not ameliorate the doubts raised by the inconsistencies in his testimony, let alone compel the IJ and the Board to credit his testimony.

We also conclude that the IJ was on solid ground in doubting Sundararajan's account of escaping from the LTTE camp. It is true that Sundararajan, both on cross-examination by the government and during supplemental questioning by the IJ, soft-pedaled the confining nature of the camp. A.R. 181, 193. But when specifically asked by the IJ as to whether he was taken to the camp against his will, he testified expressly that "they forcibly took me." A.R. 191. He also testified that the people who took him had weapons. A.R. 192. Moreover, the camp was, by Sundararajan's own account, both fenced and patrolled by guards. A.R. 180-81, 396. Under those circumstances, the IJ not unreasonably concluded that Sundararajan and other "guests" of the LTTE would not have been free to come and go as they wished, and that Sundararajan would not have been permitted to leave the camp at 4:00 a.m., never to return. Sundararajan himself described his departure using various forms of the word "escape," which suggests that the LTTE had him in its custody. A.R. 165, 182, 195, 396.

As for the discrepancy between Sundararajan's asylum application and his testimony regarding the date of his

departure from Sri Lanka, the IJ was by no means compelled to accept the explanation that the date on the application was a mistake owing to Sundararajan's inability to consult with his attorney in person during the preparation of the application. Sundararajan's counsel speaks the Tamil language and on the application form itself verified that it had been read to his client in his native language, A.R. 391, and Sundararajan acknowledged that he had reviewed the application before signing it, A.R. 149-51. As the IJ pointed out, the date of his departure is discussed more than once in the application, and it consistently states or implies that Sundararajan left Sri Lanka in July rather than September as he later testified, making it less likely that Sundararajan would have overlooked any error. A.R. 383, 389; *see also* A.R. 386 (listing his last dates of residence and employment in Sri Lanka as July 2006).

Both the IJ and the Board accurately recited the governing criteria for credibility determinations, A.R. 4, 58-61, and the IJ's decision not to credit Sundararajan, as affirmed by the Board, is reasonable and consistent with the record evidence. Perhaps a different factfinder might have credited Sundararajan, but we cannot say that it was unreasonable for Judge Videla not to do so. *See Balogun v. Ashcroft*, 374 F.3d 492, 507-08 (7th Cir. 2004).

B.   Corroboration

After concluding that Sundararajan's account of his experiences in Sri Lanka was not credible, the IJ determined that it was reasonable to expect him to provide

corroboration of the events to which he testified, including some sort of statement from his wife. A.R. 80-81. Sundararajan had failed to supply such corroboration, in the IJ's view, and that failure contributed to the IJ's conclusion that Sundararajan had presented insufficient evidence to support the notion that he would be persecuted if returned to Sri Lanka. Sundararajan faults this portion of the IJ's analysis for overlooking what corroborative evidence he did present to the court. He notes that the UNHCR report and other background evidence he presented do substantiate the types of abusive practices by both the LTTE and Sri Lankan authorities that he described in his testimony. And as for substantiation of his own allegations, he reminds us that he submitted proof that a complaint was made on his behalf to the Human Rights Commission of Sri Lanka, a letter from Reverend Jeremiah Arasarathinam, and an extract from a police station book. The IJ's decision was silent as to these three documents. Finally, he contends that he adequately explained why he could not produce a letter or other evidence from his wife: He testified that she had been staying with Reverend Arasaratnam in the past, but that, at the time of the hearing, she was moving from place to place in order to avoid the Sri Lankan armed forces and he did not know how to reach her.

Given the modifications to the Immigration and Nationality Act effected by the REAL ID Act, an immigration judge now enjoys substantial leeway to demand corroboration of an asylum applicant's allegations whether or not the judge finds the applicant credible. *Rapheal v. Mukasey*, 533 F.3d 521, 527 (7th Cir. 2008). Only if such

evidence is beyond the reasonable ability of the immigrant to obtain is the judge precluded from demanding corroboration. 8 U.S.C. § 1252(b)(4); *Eke v. Mukasey*, 512 F.3d 372, 381 (7th Cir. 2008).

We find no error in the Immigration Judge's expectation that Sundararajan produce additional evidence to corroborate his account of past persecution. We note that the Judge's adverse credibility determination was made independent of the lack of corroboration; only after he had deemed Sundararajan incredible—and, as we have discussed, that finding was not erroneous—did the judge look for corroboration of his account. A.R. 80. It was not unreasonable for the judge to look for corroboration from Sundararajan's wife in particular, given that she was a witness to some of the harassment and coercion he allegedly experienced from the LTTE and it was she who allegedly got him out of jail in Colombo. Although it is true that Sundararajan seemed to suggest at one point in his testimony that he did not know how to reach her in Sri Lanka, his testimony on this score was inconsistent, for at other times the clear implication of his testimony was that he knew "where about she [was]," and could reach her, although only by mail. A.R. 176. Plus, she had supplied other evidence to support Sundararajan's case, so it was not unreasonable to surmise that she could have submitted her own statement at that time, even if she later fell out of contact with her husband. As for the Immigration Judge's failure to specifically address all of the background and other evidence that Sundararajan did submit, any omission in that respect was harmless, as the evidence did not

materially corroborate the events to which he testified. The UNHCR report, for example, speaks to the types of human rights abuses that occur in Sri Lanka but says nothing about what did or did not happen to Sundararajan. *See Rashiah v. Ashcroft*, 388 F.3d 1126, 1133 (7th Cir. 2004). The evidence as to the complaint filed with the Sri Lankan Human Rights Commission says nothing beyond that a complaint was filed. A.R. 244. The police report that Sundararajan's wife filed makes only a passing allegation that he left Sri Lanka due to harassment similar to what she and her children were experiencing and does not meaningfully corroborate the events to which he testified before the IJ. A.R. 235. And the Reverend's letter suggests that he has no personal knowledge of what Sundararajan had experienced; moreover, like Sundararajan's asylum application, it suggests that Sundararajan left Sri Lanka in July rather than September 2006. A.R. 245.

C.  Remand for hearing on persecution as failed asylum-seeker

Sundararajan next argues that the Board erred in declining to remand the case to the IJ with directions to consider the possibility that Sundararajan may face persecution as a failed asylum seeker. In the statement that Sundararajan attached to his I-589 application for asylum and other relief, he stated that the Sri Lankan authorities typically arrest at the airport anyone returned to the country involuntarily, and that Tamil refugees have often disappeared while in detention at the

airport. A.R. 398. He made a similar assertion in his testimony. A.R. 177. At the conclusion of the evidentiary hearing before the Immigration Judge, Sundararajan's attorney argued in closing that he had an independent claim for relief as a failed asylum-seeker. A.R. 221-23. But the IJ never explicitly addressed this possibility in his decision. For its part, the Board in a footnote indicated that it was unnecessary for the IJ to do so given the judge's adverse evaluation of Sundararajan's credibility. A.R. 5 n.1. Sundararajan faults that reasoning as untenable, given that the IJ's credibility determination related to his past experiences in Sri Lanka, which have nothing to do with the possibility that he might be persecuted for having unsuccessfully sought asylum in the United States.

Given the lack of record evidence supporting this claim, however, Sundararajan was not entitled to a hearing. The only evidence in the record supporting the notion that Sundararajan might face persecution as a failed asylum seeker is his own statement in support of his asylum application and his testimony at the hearing. This evidence is itself minimal, and Sundararajan never articulated the basis for his knowledge that failed asylum seekers face arrest and abuse upon their return to Sri Lanka. Given that the IJ did not credit him as a witness, there was effectively no evidence to support this claim. And although Sundararajan points out that the Second Circuit ordered a hearing on a similar claim in *Ramsameachire v. Ashcroft*, 357 F.3d 169, 184-85 (2d Cir. 2004), notwithstanding the IJ's adverse credibility determination, in that case the alien had proffered evidence

sufficient to support the claim, *see id.* at 184. Sundararajan
failed to offer sufficient evidence here.

D.   Pattern or practice claim

As Sundararajan points out and as both the IJ and the
Board recognized, he may prevail on his asylum claim
even without credible evidence that he is likely to be
singled out for persecution if he can establish a pattern
or practice of persecution in Sri Lanka based on a pro-
tected trait (*e.g.*, ethnicity) that he shares. *See* 8 C.F.R.
§ 208.13(b)(2)(iii). But the level of persecution must be
extreme in order to demonstrate such a pattern or prac-
tice. *Mitreva v. Gonzales*, 417 F.3d 761, 765 (7th Cir. 2005).
"There must be a systematic, pervasive, or organized effort
to kill, imprison, or severely injure members of the pro-
tected group, and this effort must be perpetrated or
tolerated by state actors." *Id.* (internal quotation marks and
citations omitted). The standard for showing a pattern or
practice is high because it relieves the individual alien of
presenting evidence that he in particular would likely
experience persecution if returned to his country and in
theory would entitle everyone else from his country who
belongs to the protected group to asylum in the United
States. *Id.*

The background evidence that Sundararajan has sub-
mitted, including in particular the December 2006
UNHCR report documenting the mistreatment of Tamils
in Sri Lanka (and which recommends that no Tamil from
the northern or eastern regions of the country be forced

to return) gives us pause, as it did the IJ. A.R. 82. The lengthy armed conflict between the LTTE and the Sri Lankan armed forces has resulted in human rights abuses by both sides, and there is little reason to doubt that innocent Tamils have been arrested, imprisoned, and even tortured by the authorities. But our cases make clear that civil strife in a country that causes substantial hardships for an ethnic minority, some of whose members are engaged in an insurgency against the government, does not automatically render each non-combatant member of that minority a subject of persecution. *See Selimi v. Ashcroft*, 360 F.3d 736, 740-41 (7th Cir. 2004); *see also Ratnasingam v. Holder*, 556 F.3d 10, 14 (1st Cir. 2009); *Garcia v. Gonzales*, 500 F.3d 615, 618-19 (7th Cir. 2007); *Rashiah v. Ashcroft, supra*, 388 F.3d at 1133. Sundararajan has shown that many Tamils in Sri Lanka have suffered grave deprivations of their human rights, but the Board's conclusion that this does not rise to the level of systemic persecution of Tamils based on their ethnicity was not unreasonable. The background evidence indicates that Tamils face an extremely difficult life in Sri Lanka, but it does not reflect the extreme degree of mistreatment necessary to establish a pattern or practice of persecution. Although we are deeply concerned about the abuses that have taken place in Sri Lanka, we cannot say that the evidence Sundararajan has presented is so compelling as to permit us to disturb the Board's finding that it does not show systemic persecution of ethnic Tamils like himself.

E.   CAT claim

Finally, Sundararajan challenges the summary rejection of his CAT claim, which neither the Board nor the IJ addressed at any length. The IJ noted that because he had not found Sundararajan to be a credible witness, "I cannot find that the respondent has established that it is more likely than not that, if he is returned to Sri Lanka, first, that he would be arrested by anyone and, secondly, that the respondent, in fact, after being arrested, will be physically mistreated which would constitute torture under the Convention." A.R. 84. The Board affirmed the IJ's reasoning on that point. A.R. 6. Sundararajan contends that because his CAT claim is premised on different factors than his asylum claim, it was error to dismiss this claim out of hand without more extensive analysis. Even if his testimony about his experiences in Sri Lanka is discounted, Sundararajan maintains, he still has a viable claim under the CAT based on his Tamil ethnicity and his status as a failed asylum seeker.

In order to establish his eligibility for relief under the CAT, Sundararajan must show that it is more likely than not that he will be tortured in Sri Lanka, *e.g.*, *Khan v. Filip*, 554 F.3d 681, 690 (7th Cir. 2009), and substantial evidence supports the Board's determination that he did not make such a showing. The statement Sundararajan attached to his asylum application and his testimony before the IJ supplied the sole evidentiary support for his CAT claim, and given the IJ's adverse credibility determination, Sundararajan did not present credible evidence either that he had experienced past persecution

in Sri Lanka or that, as a failed asylum seeker, he was likely to face torture upon his return to that country. And as we have already discussed with regard to the pattern or practice claim, although Tamils have undoubtedly faced severe hardships in Sri Lanka, the evidence does not support the conclusion based on Sundararajan's ethnicity alone that he is more likely than not to experience torture in Sri Lanka.

### III.

The decision whether to follow the UNHRC's recommendation not to return Tamils to Sri Lanka until conditions there improve belongs to the Executive Branch. Our authority is limited to reviewing the decisions of the Immigration Judge and the BIA based on the evidence presented in this particular case. Substantial evidence supports the Board's conclusion that Sundararajan does not have a well-founded fear of persecution in Sri Lanka and that he has not shown it to be more likely than not he will be persecuted and/or tortured upon his return to that country. We therefore DENY Sundararajan's petition for review of the BIA's order refusing him his requests for asylum, restriction on removal, and relief under the CAT.