NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 9, 2012[*]
Decided May 9, 2012

**Before**

JOEL M. FLAUM, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 11-3057

| | |
|---|---|
| LIANGYONG WENG, | Petition for Review of a Decision of the |
| *Petitioner*, | Board of Immigration Appeals |
| | |
| *v.* | No. A099-345-172 |
| | |
| ERIC H. HOLDER, JR., | |
| Attorney General of the United States, | |
| *Respondent*. | |

**O R D E R**

Liangyong Weng, a 37-year-old Chinese man, petitions for review of an order of the Board of Immigration Appeals upholding an immigration judge's denial of his requests for asylum, withholding of removal, and relief under the United Nations Convention Against Torture (CAT). Because the Board's decision is supported by substantial evidence, we deny the petition.

---

[*] The parties have waived oral argument in this case, and thus the appeal is submitted on the briefs and record. *See* Fed. R. App. P. 34(a)(2)(C).

Weng entered the United States without permission in 2005 and applied for asylum in Chicago ten months later. His application was initially denied but later referred to an IJ for a hearing. At his hearing Weng claimed that authorities in his home province of Fujian had persecuted him because of his resistance to China's family-planning policy. He recounted that, after his wife gave birth to a son, local officials forced her to have an intrauterine device implanted. Because he and his wife wanted to have another child, Weng explained, he fled to South Korea (with his wife to follow some time later), but he was caught by Korean police and returned to China. Back in China, he was convicted of illegal departure and sent for four months to a "labor camp," where he worked 12- to 13-hour days manufacturing lighters and was beaten for not meeting quotas or reciting inmate rules. After his release, he said, his wife had her IUD removed "in secret" and became pregnant, but Fujian officials forced her to abort the pregnancy. He testified that, when his wife then became pregnant again and was taken to the hospital for a second abortion, he got into "an altercation" with five to six officials guarding her hospital-room door; they struck him in the forehead with a broken bottle, he said, and then "tied [him] up" to a tree outside the hospital's entrance.

In support of his application, Weng submitted a number of documents, including certificates for the abortions and IUD removal. The government questioned the authenticity of these documents by presenting testimony from a Department of Homeland Security document examiner, who pronounced them counterfeit. The examiner noted that the medical certificates were made with handcut paper, rudimentary printers, and hand-stamped serial numbers—unlike the mass-produced forms expected from the large hospital system that purportedly issued them. The examiner added that the "idiosyncratic design" of the serial numbers suggested that they had been stamped by the same device used on 4 other documents (on file in her lab) dating back 5 and 13 years—reflecting the handiwork of a common manufacturer. The government also elicited an admission from Weng that he had not received a receipt for the IUD removal because it was "done in a secret manner."

The IJ denied Weng's applications, finding him not credible because of material inconsistencies in his testimony and documents. For example, Weng gave shifting accounts of the events leading to his wife's second abortion, first claiming that an official escorted her to the check-up where the pregnancy was discovered, but later saying that he alone accompanied her. Additionally, Weng testified that he received no receipt for the IUD removal (despite the certificate he provided), gave inconsistent dates for the IUD removal, and contradicted a statement in his initial application by testifying that his wife did not have a second IUD inserted. The IJ also credited the document examiner's opinion that the medical certificates were counterfeit, despite Weng's testimony that they had been issued from the hospital. Even assuming Weng to be credible, the IJ alternatively concluded that he failed to establish his eligibility for asylum, withholding, or CAT relief. According to the IJ,

Weng's account of his fight with officials was "vague and inconsistent" and thus insufficient to show persecution, and his detention for illegal departure also was not persecution because there was no evidence that he was detained because of resistance to China's family-planning policy.

Weng appealed to the Board, which upheld the IJ's decision. The Board found "no clear error" in the IJ's decision to discredit Weng; the IJ "properly identified numerous discrepancies" in his account of events and reasonably relied on the document examiner's opinion. The Board also agreed with the IJ's alternative conclusion that Weng failed to satisfy his burden of proving persecution or torture.

In this petition, Weng primarily challenges the adverse credibility finding relied upon by the Board and the IJ to deny his applications. He targets three aspects of the adverse credibility finding: the contradictory accounts of the events leading to the second abortion, the discrepancy about the date of the IUD removal, and his knowledge that the medical certificates he presented were fraudulent.

We will reverse the Board's decision only if the evidence compels a different result, *Abraham v. Holder*, 647 F.3d 626, 632 (7th Cir. 2011); *Toure v. Holder*, 624 F.3d 422, 427 (7th Cir. 2010), and will disturb an IJ's credibility assessment only in "extraordinary circumstances," *Rama v. Holder*, 607 F.3d 461, 465 (7th Cir. 2010); *Krishnapillai v. Holder*, 563 F.3d 606, 617 (7th Cir. 2009).

There is no reason here to overturn the Board's decision. First, Weng asserts that his differing accounts of his wife being escorted or unescorted for her pregnancy checkup were "not necessarily" contradictory. Weng acknowledges, however, that he changed his testimony—from her being escorted by a family-planning official to her being accompanied by him alone—and the IJ had no obligation to adopt Weng's strained reading of his own testimony. Second, Weng acknowledges giving different dates for his wife's IUD removal, but downplays this discrepancy as immaterial because the IUD removal was not at "the heart" of his petition. But even if the dates were unimportant, his inconsistent statements in no way *compel* a finding that he was credible, *see Krishnapillai*, 563 F.3d at 617, especially since the IJ raised other serious concerns about Weng's credibility, including his submission of counterfeit documents and his contradictory testimony about whether his wife had a second IUD inserted. *See Tarraf v. Gonzales*, 495 F.3d 525, 534 (7th Cir. 2007). Third, Weng notes that we have previously rejected credibility determinations based on counterfeit documents when the record does not show whether the petitioner knew that a document, sent to him by a third party, was forged. *See Hanaj v. Gonzales*, 446 F.3d 694, 699 (7th Cir. 2006); *Kourski v. Ashcroft*, 355 F.3d 1038, 1039 (7th Cir. 2004). But as the IJ observed, this situation is distinguishable from *Hanaj* and *Kourski* because here Weng must have known

that his medical certificates were forgeries because he attested to their authenticity and claimed receiving them directly from the hospital.

Weng also asserts, in cursory fashion, that the injuries he allegedly sustained in resisting his wife's abortion and his detention for illegal departure "may well rise to the level of past persecution." But because we defer here to the IJ's credibility determination, we need not decide whether Weng's account of his altercation with Fujian officials would reflect persecution. As for his detention, eligibility for asylum or withholding depends on an alien showing that he suffered persecution (or has a well-founded fear of persecution) "*on account of* race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (emphasis added); *see* 8 U.S.C. § 1158(b)(1)(B)(i); *Bueso-Avila v. Holder*, 663 F.3d 934, 937 (7th Cir. 2011). As the IJ noted, there is no evidence here that Chinese officials even knew about Weng's opposition to the family-planning policy when they detained him.

The petition for review is DENIED.