NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 13, 2012
Decided February 5, 2013

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 12-1350

| | |
|---|---|
| MEIXIAO LIU,<br>    *Petitioner*, | Petition for Review of an Order of the<br>Board of Immigration Appeals. |
| *v.* | A089-689-367 |
| ERIC H. HOLDER, JR.,<br>Attorney General of the United States,<br>    *Respondent*. | |

**O R D E R**

Meixiao Liu, a 39-year-old Chinese national, fled to the United States after protesting government actions to remove his family from their home. He seeks asylum on the grounds that he expressed a political opinion when he complained to the local government about low compensation and was beaten and detained in response. Liu petitions for review of an order of the Board of Immigration Appeals upholding the immigration judge's denial of his request for asylum and withholding of removal. The Board properly denied Liu's petition for failing to meet his burden of proof under the standards of the REAL ID Act, *see* 8 U.S.C. § 1158(b)(1)(B), so we deny the petition for review.

We recount Liu's story based on his testimony, written statement, and neighbors' affidavits. Liu lived with his wife and son in a tiny (130 square foot), one-story home in Shenyang, the capital and largest city of Liaoning Province in northeastern China. Their neighborhood occupied a prime tract of real estate, and in 2007 the local government ordered

him and his neighbors to relocate so the homes could be torn down and replaced with larger houses. When the government offered what Liu and his neighbors considered to be inadequate compensation ($31.50 dollars per square foot, totaling a little under $4,100 for Liu's house), he complained to the "Department of Relocation" on his and other residents' behalf, arguing that the level of compensation was insufficient to allow them to relocate to new homes. As land prices in Chinese cities have risen, forced evictions and corresponding protests have also escalated, leading to sometimes-violent government responses. See U.S. Dep't of State, 2011 Country Report on Human Rights Practices: China 21, 33 (March 2012); Andrew Jacobs, *Harassment and Evictions Bedevil Even China's Well-Off*, N.Y. Times, Oct. 27, 2011, at A4; Amnesty International, Standing Their Ground: Thousands Face Violent Eviction in China 4 (October 2012).

Five months after the initial notice, bulldozers and government workers arrived and began demolition without warning while Liu's family was still living in their home. Liu's house was the first one destroyed, and the bulldozers razed at least ten other homes in the neighborhood. A police officer pushed Liu to the ground when he tried to reenter his house, and he was repeatedly kicked by a group of people — among them government workers — before being dragged away to a police vehicle. The police took Liu to a hospital, where he received stitches for a deep gash he suffered by landing on a shard of broken glass. Liu testified that he was detained for three days and beaten by guards who said he "defied the government." A few days after his release, he said, he led a protest with his neighbors in front of a local government office where they held signs demanding a place to stay—not money; after a day and night of protest he was again detained and beaten by police, who called him "the leader of rioters." Over the next four months, Liu says, he was detained and beaten by police four additional times until his family and friends raised the money to smuggle him out of China and into the United States.

The Board of Immigration Appeals upheld the immigration judge's denial of asylum and withholding of removal on two grounds. First, the Board agreed with the immigration judge that Liu failed to meet his burden of proof under the REAL ID Act, *see* 8 U.S.C. § 1158(b)(1)(B)(ii), because he did not provide affidavits from his family members or neighbors corroborating the post-demolition events. Second, the Board found that he also failed to show that he expressed a political opinion or had one imputed to him by the government. Construing Liu's claim as suffering persecution for protesting the "unreasonable taking of his home," the Board ruled that there was "no evidence that the complaints the respondent filed espoused a political opinion and that the subsequent forcible seizure of the houses was on account of these complaints and political opinion."

Liu argues in his petition that the Board erred in deciding that he was not persecuted on account of a protected ground — *i.e.*, his political opinion, which he characterizes as opposing the government's policy of taking his home without providing reasonable compensation. Based on *Chen v. Holder*, 607 F.3d 511 (7th Cir. 2010), he contends that protesting

the government's unreasonable taking of property is a political opinion. He also asserts that the Board erred in requiring corroboration for each individual event instead of looking at all of the events as a whole.

Under the REAL ID Act, immigration judges have wide discretion to ask for corroboration, even when they find the applicant otherwise credible, as was the case here. See 8 U.S.C. § 1158(b)(2)(B)(ii); *Haichun Liu v. Holder*, 692 F.3d 848, 853–54 (7th Cir. 2012). The immigration judge reasonably required Liu to provide corroborative evidence of a post-demolition protest and of additional beatings and detentions to meet his burden of proof in showing past political persecution. Liu has not explained how the immigration judge erred by expecting him to provide affidavits from his family and neighbors that describe post-demolition events. Unless Liu can show that this evidence was not reasonably available, the failure to produce it is "fatal to [his] claims." *Raghunathan v. Holder*, 604 F.3d 371, 379 (7th Cir. 2010). Because Liu was still in contact with his family, affidavits from his family were presumably available. *See Krishnapillai v. Holder*, 563 F.3d 606, 619 (7th Cir. 2009). And Liu submitted statements from four of his former neighbors concerning the initial complaints and demolition, so statements from these neighbors describing the post-demolition protest also appear to have been reasonably available. *Id*. Because Liu failed to produce this corroborative evidence, we deny his petition for review.

We are troubled, however, by the Board's cramped view of political opinion. Whether demands for compensation for seized homes have a political dimension requires an inquiry into the broader political context and the government's response. See *Chen*, 607 F.3d at 514. As the Second Circuit helpfully explained, opposition to government policies has a political dimension "when it transcends mere self-protection and represents a challenge to the legitimacy or authority of the ruling regime." *Zhang v. Gonzales*, 426 F.3d 540, 548 (2d Cir. 2005); compare *Haichun Liu*, 692 F.3d at 852–53 (explaining that organizing 16 laid-off workers to ask for their jobs back at a state-run factory was an economic demand, not a political protest), with *Yu v. Holder*, 693 F.3d 294, 299 (2d Cir. 2012) (remanding where petitioner organized 10 workers to complain to factory official about embezzlement of wages and police recognized his handwriting on an anonymous complaint letter). Because Liu's petition falters on his failure to provide corroboration, we do not reach the Board's understanding of the term "political opinion." See *Musabelliu v. Gonzales*, 442 F.3d 991, 996 (7th Cir. 2006).

PETITION DENIED.