NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 18, 2016
Decided September 27, 2016

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

LYNN S. ADELMAN, *District Judge**

No. 15-3747

| | |
|---|---|
| MILKIYAS AMBA, <br> *Petitioner*, | Petition for Review of an Order of the <br> Board of Immigration Appeals. |
| *v.* | No. A089-318-722 |
| LORETTA E. LYNCH, <br> Attorney General of the United States, <br> *Respondent*. | |

**O R D E R**

Milkiyas Amba, a 58-year-old native and citizen of Ethiopia, entered the United States on a nonimmigrant visitor visa on September 7, 2009. Two weeks later he applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). An asylum officer interviewed him and referred his application to an immigration judge. Amba thereafter overstayed his visa, triggering removal proceedings. Amba conceded removability but renewed his requests for asylum, withholding, and CAT protection. An immigration judge denied these claims for relief, finding Amba's testimony insufficiently persuasive and lacking necessary corroboration. Alternatively, the immigration judge found that Amba's testimony did not demonstrate

---

*Of the Eastern District of Wisconsin, sitting by designation.

that he had suffered persecution or reasonably feared persecution if forced to return to Ethiopia. The Board of Immigration Appeals ("BIA") affirmed and ordered Amba removed, and he now seeks review of the agency's decision. We deny the petition for review.

## I. Background

Amba grew up in Wolayta Sodo, in southern Ethiopia, but has lived in Addis Ababa, the nation's capital, since the early 1990s. He is married with five children, and his family remains in Ethiopia. The factual backdrop for his persecution claim begins with his decision in 1977 to enlist in the Ethiopian military. Three years earlier the Ethiopian government was overthrown by a communist military junta known as "the Derg." When Amba enlisted in the Derg military, the junta was attempting to pacify a rebellion in parts of present-day Eritrea, which was then formally Ethiopian territory.

In his testimony before the immigration judge, Amba gave the following account of his service in the Derg military and his return to civilian life. He was initially stationed in an artillery battery in Barentu, an area that saw intense fighting between the Derg military and Eritrean rebel forces. In July 1978 he was briefly transferred from his artillery post to work as a translator between Soviet military advisors and the Derg military, but after about a month, he returned to Barentu to help arrange civilian air transport into and out of the war zone. Amba served there for a little less than a year before traveling to then-Soviet Ukraine for training in "psychology and military pedagogy." When he finished this training, he was assigned a "political guidance position" teaching history, philosophy, and discipline to Ethiopian soldiers.

Amba served in the Derg military until 1991 when the junta was overtaken by the Ethiopian People's Revolutionary Democratic Front. At that point Amba defected from the military and returned to his hometown in southern Ethiopia. He was thereafter instructed to report to the new regime. The first time he did so he was simply asked to turn over his gun, but the second time he was arrested and imprisoned along with others who served in the Derg military. He bailed out 15 days later, but spent just two days with his family before he was again arrested and taken to a windowless warehouse that was used to incarcerate about 500 other prisoners. He was kept there for five months. Conditions were unsanitary, and no medical treatment was available for the prisoners, who received only malaria tablets and two meals a day provided by the Red Cross. His confinement was punctuated with threats from the guards, who regularly made

the prisoners sit outside in the punishing sun for extended periods of time. Apart from these poor conditions, however, Amba was not physically harmed.

By the time Amba was released, he was "very, very sick" from the unsanitary conditions in the warehouse. He returned to his family home in southern Ethiopia, recuperated there, and then moved to Addis Ababa to look for work. He first found a job teaching language courses to Americans and a few years later was hired as an assistant administrator at a hospital largely funded by American, British, and Australian donors. In 2007 Amba left his job at the hospital to work for Bethany Christian Services, an international Christian aid organization that needed Ethiopians to form the local branch of the organization because the government would not permit foreigners to do so. As the organization's country director, he managed the Ethiopian operations, which included working with American visitors and foster parents. In 2008 Bethany Christian Services flew him to the United States for job training.

Amba also spent some of his time in Addis Ababa volunteering with Africa Peace and Conflict Management, a now-defunct organization that worked to resolve conflicts in Ethiopia's border regions. Africa Peace was led by Bogale Ashango, a childhood classmate of Amba's, and was the subject of harassment by the Ethiopian government. Amba began his involvement with Africa Peace in 2004. He testified that in 2005 Ashango told him that security agents for the Ethiopian government broke into his (Ashango's) office to threaten him and confiscate his documents.

Amba testified that in early June 2009, he was the victim of similar harassment. Two men who appeared to be soldiers in the Ethiopian army forcibly entered his office at Bethany Christian Services and accused him of conspiring against the Ethiopian government. They threatened to harm him if he refused to stop opposing the regime and warned him not to tell anyone about the incident. This threat occurred during the election season when security forces were attacking people suspected of opposing the regime. Amba testified that he thought the government targeted him because his work involved interacting with many foreigners and because of his 2008 travel to the United States. Amba told three other people about this incident: his wife, his friend Ashango, and a coworker named Sisay Kassaye. He testified that Kassaye advised him to flee the country.

Amba said that he then took a month-long break from his job with Bethany Christian Services and formally quit the organization in July 2009. He departed for the United States in September 2009 using the unexpired visa he had obtained for his earlier trip with Bethany Christian Services.

The immigration judge found Amba's testimony generally credible but noted a handful of inconsistencies between it and earlier statements Amba had given to the asylum officer. First, Amba told the asylum officer that he had witnessed civilians being harmed by the military while he was stationed in Barentu. In his testimony before the immigration judge, he denied seeing any civilian casualties while stationed in Barentu. Second, Amba's résumé states that he worked at Bethany Christian Services until September 2009. He told the asylum officer a different story: He said that after the June 2009 break-in, he lived at home and went to work at the office in the evening. Neither version is consistent with Amba's testimony at the removal hearing. He told the immigration judge that he took a month-long leave from Bethany Christian Services after the June break-in and formally quit the organization in July 2009.

Third, Amba told the asylum officer that he had last spoken with his children a month before the asylum interview. When asked why he hadn't been in contact with them since then, Amba said he felt like he "should get acquainted here—it is financially expensive to call them." But at the hearing Amba gave a different explanation for his lack of communication with his family and friends back home. When the immigration judge asked if Amba had ever attempted to obtain corroborating evidence from his wife, his friends Ashango or Kassaye, or anyone else in Ethiopia, Amba replied that he thought his written and telephonic communication could be monitored by the Ethiopian government and that the government would punish anyone it thought was helping him.

The immigration judge concluded that in the aggregate these inconsistencies reduced any persuasiveness Amba's testimony might otherwise have had. As permitted by the REAL ID Act of 2005, the immigration judge required Amba to provide corroboration.

Amba submitted several items of evidence in an attempt to corroborate his story, including a psychological assessment, several country-conditions reports, expert testimony about conditions in Ethiopia, various documents and photographs from Africa Peace and Bethany Christian Services, and a statement from his roommate in the United States. This proffered corroboration was highly

generalized and did not directly support Amba's testimony about his 1991 detention or the 2009 break-in at Bethany Christian Services. For example, the psychological assessment generally suggested that Amba is "experiencing symptoms" that "meet the diagnostic criteria for PTSD." The country-conditions reports describe the Ethiopian government's practice of surveilling and persecuting suspected dissidents and also highlight a 2009 law giving the Ethiopian government broad power over the management and operations of non-governmental organizations ("NGOs"). The expert witness—Dr. Donald Levine, a professor emeritus at the University of Chicago—testified that the 2009 NGO law was consistent with the Ethiopian government's general hostility to NGOs, especially conflict-resolution organizations. Dr. Levine explained that NGOs controlled by foreigners are particularly suspect because the government believes "outside powers" were responsible for stirring up dissidents during the 2005 election. He also said that to tamp down dissent, the government conducts surveillance and harassment "on all fronts." But he had no specific knowledge of Africa Peace or Bethany Christian Services. Likewise, none of the other proffered corroboration directly supported Amba's story.

The immigration judge found that this additional evidence was insufficient to corroborate Amba's story about his 1991 detention and the 2009 break-in at Bethany Christian Services, which were the crucial aspects of his claim. The judge noted that Amba had not even tried to obtain corroboration from any of the people with knowledge of either or both incidents—his wife, for example, or Ashango or Kassaye—and failed to substantiate his assertion that the Ethiopian government would intercept any attempt at communication he might make. Alternatively, the judge held that even if he accepted the corroboration and credited Amba's story, the 1991 detention and the 2009 break-in did not amount to past persecution. Although the conditions in the detention facility were wretched, Amba was never physically abused. And the 2009 break-in, the immigration judge held, was an isolated incident of harassment—unnerving, to be sure, but not an immediate or particularly menacing threat.

For the same reasons, the immigration judge concluded that Amba failed to carry his burden of establishing a reasonable possibility of future persecution. The immigration judge accordingly rejected Amba's asylum claim and also denied withholding of removal and relief under the CAT, both of which are governed by a more stringent legal standard. The BIA affirmed on all grounds. Amba now seeks review in this court.

## II. Discussion

To be eligible for asylum, an applicant must establish that he is a "refugee," which the law defines as someone who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(42)(A) (defining refugee), 1158(b). The REAL ID Act of 2005 permits an applicant to rely solely on his own testimony provided that he "satisfies the trier of fact that [his] testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that [he] is a refugee." *Id.* § 1158(b)(1)(B)(ii). But "[w]here the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." *Id.* This provision gives immigration judges "substantial leeway to demand corroboration of an asylum applicant's allegations whether or not the judge finds the applicant credible." *Krishnapillai v. Holder*, 563 F.3d 606, 618 (7th Cir. 2009). If an immigration judge orders an applicant to produce corroborating evidence but the applicant fails to do so—and fails to explain why the requested evidence is not reasonably available—the immigration judge may properly deny the application.[1] *Id.*

We review the immigration judge's conclusions, as supplemented by the BIA's opinion, under the "substantial evidence" standard. *Raghunathan v. Holder*, 604 F.3d 371, 379–80 (7th Cir. 2010) (rejecting petitioners' arguments that the documents they submitted satisfied the corroboration requirement and their contention that they provided sufficient explanations for their inability to produce corroboration). This standard is "highly deferential," and we "will not grant the petition for review unless the petitioner shows that the evidence not only *supports* reversal of the BIA's decision, but *compels* it." *Liu v. Ashcroft*, 380 F.3d 307, 312 (7th Cir. 2004) (internal quotation marks, brackets, and citation omitted). The agency's decision here easily clears this bar.

---

[1] This standard applies with equal force to applications for withholding of removal and protection under the Convention Against Torture. *See* 8 U.S.C. §§ 1158(b)(1)(B)(ii) (asylum applications), 1229a(c)(4)(B) (applications for protection from removal), 1231(b)(3)(C) (withholding of removal). Amba's failure to provide corroboration defeats his asylum claim and necessarily dooms his applications for withholding of removal and protection under the CAT as well. *See Haichun Liu v. Holder*, 692 F.3d 848, 854 (7th Cir. 2012); *see also Musollari v. Mukasey*, 545 F.3d 505, 508 n.2 (7th Cir. 2008).

The BIA agreed with the immigration judge that Amba's proffered corroboration was too general and failed to specifically support his testimony regarding his 1991 imprisonment and the 2009 break-in at Bethany Christian Services. The BIA also agreed with the immigration judge's conclusion that affidavits from people who might be expected to provide direct corroboration—Amba's wife, Ashango, Kassaye, or other friends or colleagues—were reasonably available.

The record doesn't compel a contrary conclusion. Dr. Levine's testimony and the country reports Amba provided indicate that Ethiopia's current government surveils suspected dissenters and persecutes perceived opponents of the regime. This evidence makes Amba's account somewhat more plausible, but it's too generalized to compel the conclusion that Amba was indeed imprisoned in 1991 in deplorable conditions or that he was the victim of harassment by security officers in 2009. Indeed, as the immigration judge noted, Amba's wife, who also worked for Bethany Christian Services, was never targeted for harassment, either then or since.

Amba needed more specific corroboration—the kind of evidence that reasonably might be expected to come from his relatives and coworkers. The only explanation Amba offered for his failure to obtain this evidence is a vague concern about government surveillance. The immigration judge was entitled to reject this explanation, especially given the statements Amba made to the asylum officer attributing his lack of communication to the high cost of calling home. This case is not comparable to those in which an immigration judge impermissibly faults an asylum applicant for failing to gather corroborating documentary evidence while fleeing imminent danger. *See, e.g.*, *Qiu Yun Chen v. Holder*, 715 F.3d 207, 212 (7th Cir. 2013). More to the point here, we regularly affirm decisions requiring corroborating affidavits from family members or colleagues. *See, e.g.*, *Haichun Liu v. Holder*, 692 F.3d 848, 850 (7th Cir. 2012) (affirming an immigration judge's decision to require the applicant to provide affidavits from other coworkers who demonstrated at a protest that occurred ten years before removal proceedings began). The immigration judge's determination that more specific corroboration was both required and reasonably available is well supported by substantial record evidence.

That alone is enough to deny the petition for review. We note for completeness that the agency's alternative findings—that Amba's story, even if true, did not establish past persecution or an objectively reasonable fear of future persecution—are also well supported by substantial evidence.

PETITION FOR REVIEW DENIED.