# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2256

ALMAS ABRAHAM,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

On Petition for Review of an Order of
the Board of Immigration Appeals.
A099 333 747

SUBMITTED JANUARY 19, 2011[1]—DECIDED JUNE 1, 2011

Before POSNER, KANNE and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Almas Abraham petitions for
review of a decision of the Board of Immigration
Appeals ("BIA" or "Board") denying her application for
asylum and withholding of removal. Because we lack

---

[1] We granted the petitioner's unopposed motion to waive
oral argument. Thus, the appeal is submitted on the briefs
and the record. See Fed. R. App. P. 34(f).

jurisdiction to review the Board's denial of her applica-
tion for asylum in the circumstances presented here,
we dismiss her petition with respect to asylum. We
deny her petition with respect to her application for
withholding of removal.

## I.

Abraham is a native and citizen of Syria. She is also a
Christian in a country where the vast majority of citizens
are Muslims.[2] Abraham entered the United States on
May 17, 2004, at Chicago, with a K-1 nonimmigrant visa,
which is also known as a "fiancé visa." A fiancé visa
permits a foreign citizen fiancé of a U.S. citizen to travel
to the United States to marry his or her citizen sponsor
within ninety days of arrival. *See* 8 U.S.C. 1101(a)(15)(K)(i).
Abraham did not marry her citizen sponsor within
ninety days. She also failed to depart from the United
States at the end of the ninety-day period. After over-
staying her visa for more than a year, she filed an applica-
tion for asylum on November 5, 2005.[3] Abraham was

---

[2] Seventy-four percent of Syrians are Sunni Muslims. Christians
comprise approximately 10% of the Syrian population. *See*
United States Department of State, *Background Note: Syria*,
http://www.state.gov/r/pa/ei/bgn/3580.htm  (last  visited
May 10, 2011) (hereafter "State Dept. Report").

[3] An application for asylum is automatically considered a
request for withholding of removal. *See* 8 C.F.R. § 208.3(b) ("An
asylum application shall be deemed to constitute at the
(continued...)

served with a Notice to Appear charging that she was removable from the United States because she had remained longer than was permitted. She conceded that she was removable, and her application for asylum and withholding of removal proceeded to a full hearing before an Immigration Judge ("IJ").

Abraham testified that she came from Tel-Sakra, a small village of approximately fifty households, all of whom are Assyrian Christians. While working on a farm, she met a Muslim man named Mahmood Al-Deri. She began a relationship with Al-Deri that started as a dating relationship but quickly became abusive when she refused Al-Deri's demands that she convert to Islam.[4] Al-Deri threatened to expose the relationship to her family unless she converted. Eventually he made good on his threat, and when her family learned she was dating a Muslim man, her father and her eldest brother beat

---

[3] (...continued)
same time an application for withholding of removal, unless adjudicated in deportation or exclusion proceedings commenced prior to April 1, 1997.").

[4] Like much of Abraham's testimony, her account of her relationship with Al-Deri contains a number of seeming inconsistencies. She twice described the relationship as a "dating relationship," but also said it was "forced" and "not voluntary." R. at 125, 132-33. At one point, she testified, "It was like he fall [sic] in love with me and he wanted me and I couldn't do anything about it." R. at 124. She also said that Al-Deri blamed her for starting the relationship and that for a time, she also blamed herself. R. at 132-33.

her multiple times and threw her out of the house. After a month of mistreatment, she moved to the capital city of Damascus where she met Ben Dawood, a U.S. citizen originally from Iraq. After knowing Dawood for a week, she became engaged to him and traveled to the United States on a fiancé visa. Once Abraham and Dawood were in the United States, the relationship quickly fell apart. According to Abraham, Dawood refused to carry through with his promise to marry her after his family and friends told him "bad things" about her. Abraham testified that after she broke up with Dawood, she intended to return to Syria because she had no life in the United States. She then received a letter from an uncle in Syria telling her not to return and conveying what she considered to be a thinly veiled threat. According to the uncle, Al-Deri was causing trouble for her family. The uncle warned Abraham not to return to "this tarnished land" because her actions had shamed her entire tribe and because Al-Deri had made demands on the family. R. at 221. After receiving the letter, Abraham became afraid that her father or brother would kill her if she returned to Syria because she had disgraced the family's honor. Such murders of women, inaptly referred to as "honor killings," are well-documented in Syria. *See* United States Department of State 2009 Human Rights Report: Syria, http://www.state.gov/g/drl/rls/hrrpt/2009/nea/136080.htm (last visited May 10, 2011) (hereafter "Human Rights Report") (noting that various human rights organizations report up to several hundred honor killings each year in Syria, although no official tracking takes place). Several

months after receiving this letter from her uncle, Abraham filed her application for asylum.

Abraham's testimony before the IJ was riddled with inconsistencies. She testified, for example, that she lived with her parents until she moved to Damascus, but she also testified that she spent a month living with Al-Deri's family after her family forced her to move out and before she moved to Damascus. She said that she began her relationship with Al-Deri in 2002 and that it went on for six or seven months before ending in June 2003. She later testified that the relationship began in 2001 and ended in August 2002. She told the IJ that she moved to Damascus in 2003 and became engaged to Dawood in April 2003, a time line that overlaps with her testimony that she broke off her relationship with Al-Deri in June 2003. She testified that she knew Dawood for only one week before becoming engaged to him and traveling to the United States, but she came to the United States in 2004, approximately one year after she claimed the engagement occurred. She testified that she lived with Dawood's aunt and his first cousin's family in Damascus and that the aunt introduced her to Dawood. But she also said that she lived in a church building that served as a refuge for people from Iraq, and that Dawood's aunt was the only member of his family living in the church. She testified that, except for the letter from her uncle, she had no contact with any members of her family after moving to Damascus, but she also submitted to the IJ a photocopy of a permanent resident card for one of her brothers who was living in the United States. And after telling the IJ she had no

contact with her family after leaving for Damascus, she also told the IJ that "of course" her parents knew she was coming to the United States in 2004 because she had to gather all of her documents and papers in order to file the forms to come to the United States. She testified alternately that her family first learned of her relationship with Al-Deri in 2002 and in 2003.

She testified consistently that after moving to Damascus, she suffered no more abuse from her family or Al-Deri. She conceded that she never reported any abuse from her family or from Al-Deri to the police because she did not want anyone to know what had happened and because the police do not help in these cases. The Human Rights Report confirms that the police are rarely contacted and are not helpful when a report of domestic violence is lodged.[5]

---

[5] According to the Human Rights Report, "The law does not specifically prohibit domestic violence, and violence against women occurred during the year. A 2006 study reported that as many as one in four women surveyed had been victims of domestic violence. The majority of domestic violence and sexual assault cases went unreported; victims have traditionally been reluctant to seek assistance outside the family for fear of social stigmatization. Observers reported that when some abused women tried to file a police report, the police did not respond to their claims aggressively, if at all. Women reported incidents at police stations of sexual harassment, verbal abuse, hair pulling, and slapping by police officers when attempting to file police reports, particularly at the

(continued...)

When asked what would happen if she returned to Syria, Abraham testified, "Either they would shun me and because I wouldn't have any life to live there, I probably might kill myself." R. at 129. She also testified that she feared harm from her family if she returned to Syria. Abraham also presented testimony from a cousin residing in the United States to corroborate her concern that her family might harm her if she returned to Syria. Her cousin testified that he believed Abraham would be the victim of an honor killing if she returned to Syria. He noted that he had a friend who served only three days in jail for killing his sister after she dishonored the family. The Human Rights Report also confirms that, until very recently, judges were allowed to waive or reduce punishment for perpetrators of honor killings. The law now stipulates a mandatory two-year minimum sentence for anyone convicted in an honor killing, but at the time Abraham left, a family member who killed her was unlikely to face significant legal sanctions. *See* Human Rights Report.

The IJ found that Abraham's asylum application was not timely filed and that she did not meet any of the exceptions for extending the time to file. The IJ concluded that Abraham did not meet the standards to qualify for withholding of removal or for relief under the Con-

[5] (...continued)
criminal security branch at Bab Musallah in Damascus. Victims of domestic violence have the legal right to seek redress in court, but few did so because of the social stigma attached to such action."

vention Against Torture, and therefore denied her application in its entirety. The IJ first noted that Abraham had failed to file her application for asylum within one year of arriving in the United States. Under 8 U.S.C. § 1158(a)(2)(B), a claim for asylum not filed within a year of arrival in the United States will be denied unless it meets one of the exceptions contained in the statute. The IJ rejected Abraham's argument that the letter from her uncle satisfied the only applicable exception for changed circumstances. *See* 8 U.S.C. § 1158(a)(2)(D) (permitting consideration of a late-filed application for asylum "if the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the [one-year] period"). The IJ found that the letter did not meet the materiality requirement of the statute because the letter only repeated a threat to Abraham's safety that existed when she left Syria. Because those same circumstances existed when Abraham first arrived in the United States, the IJ found that she should be held to the one-year limit for filing claims for asylum. The IJ also noted that Abraham provided no information regarding the timing of her breakup with Dawood and thus it was impossible to determine whether she filed within a reasonable time after her nonimmigrant status expired. The IJ therefore denied the application for asylum as untimely.

The IJ then considered whether Abraham was eligible to be considered for withholding of removal. In order to qualify for withholding of removal, an applicant must

demonstrate a clear probability that she will suffer persecution on account of race, religion, nationality, membership in a particular social group, or political opinion if she returns to her country of origin. *See* 8 U.S.C. § 1231(b)(3)(A). The IJ found that Abraham failed to demonstrate a "clear probability" that she would be persecuted on her return to Syria because her testimony was not credible, not persuasive, and not detailed enough to meet the standard of proof required. The IJ noted the multiple inconsistencies in Abraham's testimony and found that, absent corroboration, Abraham had not shown that it was more likely than not that she would be persecuted. The IJ also found that Abraham had failed to establish that she had been persecuted in the past on account of one of the protected grounds in the statute. Again finding that Abraham's testimony was not credible, the IJ also noted that the incidents of abuse she described were not severe, caused no injuries and required no medical treatment. Moreover, the IJ found that Abraham's stated intent to return to Syria even though these incidents occurred undermined her claim that she had been persecuted in Syria. The IJ also noted that Abraham was able to live in Damascus for some period of time without any further abuse from either her family or Al-Deri. The IJ therefore concluded that Abraham would not be seriously harmed if she returned to Syria. Finally, the IJ concluded that Abraham had also failed to establish that any abuse she suffered was due to one of the protected grounds in the statute.

Abraham appealed to the BIA. The BIA first agreed with the IJ that Abraham's claim for asylum was

statutorily barred because it was untimely. The BIA then considered Abraham's claim for withholding of removal and concluded that she failed to present sufficient corroborating evidence of critical elements of her claim. After noting that Abraham could have obtained corroboration from her brother living in the United States, the people with whom she lived in Damascus, her uncle, or anyone else who knew her in Syria, the BIA adopted and affirmed the IJ's denial of relief. Abraham's appeal was therefore dismissed.

## II.

On appeal here, Abraham argues that the IJ and the BIA applied an incorrect legal standard to her application for asylum. She also asserts that the BIA's decision is not supported by substantial evidence. Finally, she contends that we should reverse the decision denying her withholding of removal because the IJ and BIA ignored corroborating evidence that she provided and failed to forewarn her that they required additional corroborating evidence.

## A.

Section 1158(a)(2) provides that an alien must apply for asylum within one year of the date of the alien's arrival in the United States unless "the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially

affect the applicant's eligibility for asylum or extra-ordinary circumstances relating to the delay in filing an application within the period specified[.]" 8 U.S.C. § 1158(a)(2)(B) and (D). Section 1158 also provides that "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)." 8 U.S.C. § 1158(a)(3). Therefore, in general, we lack jurisdiction to review the Attorney General's rejection of an untimely request for asylum. *Restrepo v. Holder*, 610 F.3d 962, 964 (7th Cir. 2010). Notwithstanding that limitation on our jurisdiction, we retain authority to review constitutional claims and questions of law. 8 U.S.C. § 1252(a)(2)(D).

In order to get around the limit on our jurisdiction, Abraham attempts to characterize her claim as one involving a question of law. A review of her brief, however, reveals that she simply disagrees with the IJ's conclusions regarding the facts of the case. In particular, she contests the IJ's conclusion that she did not present evidence of a "material" change in circumstances. The IJ's conclusion that Abraham lacked sufficient credible evidence to meet the materiality standard is not a question of law. *Restrepo*, 610 F.3d at 964-65 (noting that our circuit limits § 1252(a)(2)(D) to strictly legal controversies, and so we are not authorized to review applications of law to facts); *Khan v. Filip*, 554 F.3d 681, 687-89 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 1049 (2010) (concluding that our review under § 1252(a)(2)(D) is limited to "pure" questions of law); *Vasile v. Gonzales*, 417 F.3d 766, 768-69 (7th Cir. 2005) (holding that the agency's determination that an alien failed to file his asylum claim within one

year and failed to qualify for an extension of time was an unreviewable question of fact and exercise of discretion). We therefore lack jurisdiction to consider Abraham's petition as it relates to her claim for asylum and dismiss that part of her petition.

**B.**

We turn next to Abraham's petition for review of the decision of the IJ and the BIA to deny her application for withholding of removal. Where the BIA's order adopts and supplements the IJ's decision, we review both. *Surganova v. Holder*, 612 F.3d 901, 904 (7th Cir. 2010); *Milanouic v. Holder*, 591 F.3d 566, 570 (7th Cir. 2010); *Krishnapillai v. Holder*, 563 F.3d 606, 615 (7th Cir. 2009); *Khan*, 554 F.3d at 690. We examine the IJ's factual findings deferentially and uphold them so long as they are supported by substantial evidence. *Krishnapillai*, 563 F.3d at 615; *Khan*, 554 F.3d at 690; *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004). Under the substantial evidence test, we must uphold the IJ's findings if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole. *Balogun*, 374 F.3d at 498. We may reverse the IJ's determinations only if the evidence compels a different result. *Balogun*, 374 F.3d at 498.

Credibility determinations are questions of fact subject to this standard of review. *Balogun*, 374 F.3d at 498. *See also Krishnapillai*, 563 F.3d at 617 (holding that only in extraordinary circumstances will this court overturn an IJ's

credibility assessment). The Immigration and Nationality Act ("INA"), as amended by the REAL ID Act of 2005, sets forth the parameters for the Immigration Judge's credibility determinations:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. . . .

8 U.S.C. § 1158(b)(1)(B)(iii). The REAL ID Act also modified the INA to allow immigration judges substantial discretion "to demand corroboration of an asylum applicant's allegations whether or not the judge finds the applicant credible." *Krishnapillai*, 563 F.3d at 618. "Only if such evidence is beyond the reasonable ability of the immigrant to obtain is the judge precluded from demanding corroboration." *Krishnapillai*, 563 F.3d at 618; 8 U.S.C. § 1252(b)(4); *Eke v. Mukasey*, 512 F.3d 372, 381 (7th Cir. 2008).

In this case, the IJ expressly found that Abraham's testimony was not credible. That finding was well-supported by the numerous internal inconsistencies in her testimony. As we noted above, she testified inconsistently on a number of issues including: (1) her living situation after Al-Deri told her family about the relationship; (2) the time line for her relationship with Al-Deri, her move to Damascus, and her engagement to Dawood; (3) whether she had any contact with her family after moving to Damascus; and (4) whether her relationship with Al-Deri was consensual or forced upon her. We will not disturb the IJ's credibility finding because it is supported by substantial evidence.

Nor is there any reason to overturn the decision of the IJ or the BIA requiring that Abraham produce corroboration of her claims. We cannot say that it would have been unreasonable in these circumstances to require corroboration because Abraham had contacts in Damascus who could verify her story, and also appears to have been in contact with her uncle and with a brother in the United States. Abraham complains that if the IJ wished for her to produce corroborative evidence, she should have been given notice of this requirement. But the REAL ID Act:

> clearly states that corroborative evidence may be required, placing immigrants on notice of the consequences for failing to provide corroborative evidence. *See* 8 U.S.C. § 1158(b)(1)(B)(ii) ("Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise cred-

ible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence."). To hold that a petitioner must receive additional notice from the IJ and then an additional opportunity to provide corroborative evidence before an adverse ruling, would necessitate two hearings—the first to decide whether such corroborating evidence is required and then another hearing after a recess to allow the alien more time to collect such evidence. This would add to the already overburdened resources of the DHS, and such an approach would seem imprudent where the law clearly notifies aliens of the importance of corroborative evidence.

*Raphael v. Mukasey*, 533 F.3d 521, 530 (7th Cir. 2008). There is therefore no need for additional notice. Abraham notes that the IJ and BIA did not address the testimony given by her cousin that she would be the victim of an honor killing on her return to Syria. That testimony did corroborate that honor killings occur in Syria and that punishment for the killers is virtually nonexistent. The cousin also stated his opinion that Abraham would be the victim of an honor killing if she returned to Syria. Although the IJ and BIA did not expressly mention this testimony, the IJ did not dispute that honor killings occurred in Syria and agreed that they are a "terrible problem" there. Oral Decision of the IJ (August 7, 2008), at 13. But the IJ found that, in light of all of the evidence, and because Abraham's family and former boyfriend did not disturb her after she moved to Damascus, it was

unlikely that they would harm her if she returned to Syria. Having reviewed the short and conclusory testimony of Abraham's cousin, we conclude that no further analysis by the IJ or the BIA was necessary. It is clear from the record and from the IJ's decision that the IJ understood all of the evidence presented and still found Abraham's proof lacking. *See Kiorkis v. Holder*, 634 F.3d 924, 928-29 (7th Cir. 2011) (recognizing that it is impossible for immigration courts to write an exegesis on every contention an applicant raises).

In short, the IJ found that Abraham did not produce sufficient credible evidence that she had suffered past persecution or would suffer persecution on her return to Syria. The IJ and BIA concluded that Abraham also failed to provide corroborating evidence of her claim in circumstances where it was not unreasonable to require her to produce corroboration. Because the decisions of the IJ and BIA are supported by substantial evidence, Abraham's petition regarding withholding of removal is denied.

DISMISSED IN PART AND
DENIED IN PART.