# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 12-2471

FH-T,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. 12-2471

ARGUED APRIL 18, 2013—DECIDED JULY 23, 2013

Before BAUER, FLAUM, and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. Petitioner FH-T appeals from the decision of the Board of Immigration Appeals affirming the Immigration Judge's removal order. Petitioner's applications for asylum and withholding of removal were denied on the basis that he had provided material support to the Eritrean People's Liberation Front ("EPLF"), which the Board and Immigration Judge

classified as a "Tier III" terrorist organization. *See* 8 U.S.C. § 1182(a)(3)(B)(vi)(III). The Board did not decide whether Petitioner would be eligible for asylum "but for" the material support bar, finding it unnecessary to reach FH-T's arguments challenging the denial of his political persecution claim on the merits. On appeal, Petitioner argues that the Board should have found him eligible for the "knowledge exemption" to the material support for terrorism bar because he did not know that the EPLF was involved in the *unlawful* use of force, as compared to the lawful use of force as part of a war of independence. Because Petitioner did not exhaust this argument before the Board, this claim cannot succeed.

Petitioner next claims that because the Board did not consider the merits of his asylum claim, he is ineligible for a terrorism bar waiver under current Department of Homeland Security ("DHS") policy, effectively nullifying a statutory right to waiver consideration. He further suggests that government procedures for adjudicating waivers are "legally flawed" because the process lacks coordination among various agencies: in most cases, the Board issues a final removal order before a waiver determination has been issued by DHS. FH-T contends that this bifurcated system frustrates Congress's provision for judicial review of exemption determinations in the context of a petition for review of final removal orders. For the following reasons, we deny the petition.

## I. Background

### A. Factual Background

FH-T joined the EPLF when he was approximately fifteen years old in 1982, while Eritrea and Ethiopia were in the midst of a war that would last thirty years. By way of background, in 1950 the United Nations General Assembly voted to merge Eritrea with Ethiopia as an autonomous federated unit, with Eritrea under Ethiopian sovereignty. Ethiopia abolished the federation unilaterally in 1962, annexing Eritrea and triggering the onset of the war. FH-T's asylum application suggests that he was motivated to join the EPLF by "youthful emotions" as well as the "prevailing war and politics." He quickly regretted this decision and attempted to return home after two days, though the EPLF refused to let him leave. He served in the EPLF for the next nine years, working in communications and as a small car and truck driver in Sudan, along the border of the southern region of Eritrea. His responsibilities primarily involved transporting food and clothing as a driver and transferring calls, as well as relaying requests for truck parts. He did not transport weapons.

In 1991, the EPLF defeated the Ethiopian army, achieving Eritrean independence. In 1994, the EPLF dissolved itself and transformed into a mass political party, the People's Front for Democracy and Justice ("PFDJ"), which remains Eritrea's only political party. The PFDJ maintains a compulsory labor program referred to as the "National Service" under which all Eritrean citizens must work for the government. While

conscription is supposed to last for eighteen months, in practice the Eritrean government frequently does not release National Service workers after their term is completed and requires them to remain in the Service indefinitely. Conscription workers labor under poor conditions and are paid meager wages. When the war ended, FH-T was employed as a transportation supervisor at a government-owned company. Many of the people with whom Petitioner worked were government conscripts.

In 2005 and 2006, Petitioner repeatedly expressed concerns about abuses of the National Service program by the PFDJ. When he received no response, he elevated his complaints to a high-ranking member of the PFDJ. This individual threatened FH-T with incarceration if he continued to voice opposition to the National Service. In June of 2006, Eritrean "Internal Security" officials arrested two of Petitioner's supervisors at the government-owned company. A month or so later on July 15, 2006, Petitioner was also arrested by two Internal Security officers.

FH-T was imprisoned in a military prison camp for approximately five months. The conditions were deplorable; inmates were housed in shipping containers without proper sanitation, ventilation, or insulation from weather conditions. Petitioner became ill and lost thirty pounds while in prison. Internal Security officers repeatedly interrogated him, accusing him of belonging to an anti-Government group. FH-T denied involvement in any such group. Nevertheless, interrogators presented him with a file detailing his complaints re-

garding the National Service and questioned his audacity in challenging the government. He was eventually released, having never been charged with or convicted of any crime. Upon release, FH-T was required to report to his office at the government-owned transportation company every day, however he was not permitted to perform any work and was not paid for his time. He also remained under surveillance by Internal Security, was regularly interrogated, and received threats upon his life. When he "believed the government was about to kill him for political disobedience," he fled Eritrea and made his way to the United States, where he filed for asylum. FH-T's father and sister were arrested when he fled the country.

### B. Procedural Background

An Immigration Judge denied FH-T's applications for asylum and withholding of removal under 8 U.S.C. §§ 1158 and 1231(b)(3) and ordered removal.[1] The denial was based upon alternative findings that (1) FH-T lacked credibility, (2) FH-T failed to prove his eligibility for asylum on the merits, and (3) FH-T was statutorily ineligible for having provided material support to the EPLF, which the Immigration Judge classified as a Tier III terrorist organization. With respect to credibility, the Immigration Judge disbelieved that Petitioner was ignorant

---

[1] The Immigration Judge granted Petitioner deferral of removal under the Convention Against Torture, which the government has not appealed.

of the EPLF's violent and "well-known terrorist activities" between 1982 and 1991, such as the EPLF's attacks on United Nations relief convoys, a large-scale 1982 attack on Asmara, and assassinations of Eritrean civilians. While FH-T testified to being present at monthly EPLF "political indoctrination" meetings where he was informed of its current actions, he nevertheless stated that he was ignorant of many such events because he did not personally witness them. Based on these equivocations, the Immigration Judge determined that FH-T was not credible.

The Immigration Judge also found FH-T ineligible for asylum and withholding of removal on the basis that his claimed persecution was not on account of a statutorily protected ground. FH-T asserted that he had been persecuted by the Eritrean government for complaining about working conditions and low pay in the National Service, however the Immigration Judge determined that FH-T's "complaints about treatment of members of the National Service within the scope of his employment with the government of Eritrea did not qualify as an expression of a political opinion for asylum purposes." The Immigration Judge further reasoned that the fact that FH-T's father and sister were arrested following his departure from Eritrea failed to establish a well-founded fear that he would be persecuted upon his return because those arrests were tied to his previous internal complaints regarding the National Service. Because he could not establish asylum eligibility, the Immigration Judge reasoned that "it necessarily follows that the respondent has failed to satisfy the

more stringent probability of persecution standard required for withholding of removal."

Finally, the Immigration Judge determined that even if FH-T were found to have suffered past persecution and/or a well-founded fear of future persecution, he would still be statutorily barred from relief for having given material support to a terrorist organization, citing Petitioner's nine years of service in the EPLF. The Immigration Judge determined that the EPLF satisfied the definition of a Tier III terrorist organization under 8 U.S.C. § 1182(a)(3)(B)(vi)(III) and further concluded that FH-T had not met his burden of showing by clear and convincing evidence that he did not know the group was a terrorist organization.

The Board affirmed the Immigration Judge's decision that FH-T was barred from receiving asylum and withholding of removal because he provided material support to a Tier III terrorist organization. FH-T had argued before the Board that the Immigration Judge erred by: (1) failing to consider his imputed political opinion theory of asylum; (2) finding that his complaints regarding the National Service amounted to mere whistle-blowing; (3) finding his denial of knowledge that the EPLF engaged in terrorist activity not to be credible; and (4) applying the material support bar because the support he provided to the EPLF was not "material." The Board rejected these challenges. The Board agreed with the Immigration Judge's determination that FH-T had not satisfied his burden of proving lack of knowledge that the EPLF was a terrorist organization, because

while Petitioner denied being aware of the EPLF's acts of violence, he often equivocated, relying on the fact that he did not personally witness the events. The Board also relied upon FH-T's testimony indicating that he had been present at monthly political indoctrinations where current events were discussed and FH-T "only heard that they [the EPLF] were attacking the civilian trucks or killing civilians." (Tr. At 195, 201-03). These equivocations, combined with the fact that FH-T served in the EPLF for nine years, led to the Board's conclusion that the Immigration Judge did not clearly err in finding that FH-T had not established with clear and convincing evidence that he did not know or should not have reasonably known that the EPLF was engaged in terrorist activities. The Board did not reach FH-T's arguments challenging the denial of his political persecution claim on the merits because it determined that the material support bar rendered him ineligible for asylum and withholding of removal. FH-T now appeals, challenging the Board's conclusion that he does not qualify for the knowledge exemption to the material support for terrorism bar, the Board's decision not to adjudicate the merits of his claim, and the process by which the government adjudicates waivers. For the following reasons, we deny FH-T's petition.

## II. Discussion

"Where . . . the Board relies on the findings of the [Immigration Judge] but adds its own analysis, we review the IJ's decision as supplemented by the Board's

additional reasoning." *Yi Xian Chen v. Holder*, 705 F.3d 624, 628 (7th Cir. 2013) (internal citation omitted). We review agency findings of fact for "substantial evidence" and may reverse the Immigration Judge's determinations "only if we determine that the evidence *compels* a different result." *Abraham v. Holder*, 647 F.3d 626, 632 (7th Cir. 2011) (emphasis added) (citing *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004). We review the Board's legal conclusions de novo, *Orejuela v. Gonzales*, 423 F.3d 666, 671 (7th Cir. 2005) (internal citation omitted), "ow[ing] the Board deference in its interpretation of the [Immigration and Nationality Act] ," *Duron-Ortiz v. Holder*, 698 F.3d 523, 526 (7th Cir. 2012) (internal citation omitted). "We are not at liberty to overturn the Board's determination simply because we would have decided the case differently." *Bueso-Avila v. Holder*, 663 F.3d 934, 937 (7th Cir. 2011) (quoting *Jamal-Daoud v. Gonzales*, 403 F.3d 918, 922 (7th Cir. 2005)).

### A. The Board's Analysis of 8 U.S.C. § 1158(b)(2)(A)(v)

An individual is barred from asylum and withholding of removal if he has provided material support to a Tier III terrorist organization, unless he can demonstrate that he "did not know, and should not reasonably have known, that the organization was a terrorist organization." *See* 8 U.S.C. §§ 1158(b)(2)(A)(v); 1182(a)(3)(B)(iv)(VI)(dd), (vi)(III). The immigration statutes delineate three tiers of terrorist organizations: Tiers I and II are designated as terrorist organizations by the Department of Homeland

Security and the Department of State, respectively. A Tier III terrorist organization, by contrast, is broadly defined as a "group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (IV), 8 U.S.C. § 1182(a)(3)(B)(vi)(iii)[2]." The "activities" referenced therein concern "terrorist activity," meaning "any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State)" and involves conduct such as assassination, violent attacks upon an internationally protected person, sabotage, and high-jacking. 8 U.S.C. § 1182(a)(3)(B)(iii). Under the so-called "knowledge exemption," the material support bar applies only if FH-T knew or reasonably should have known that the EPLF was engaged in an activity that is either unlawful where it took place or would be unlawful in the United States. *See* 8 U.S.C. §§ 1158(b)(2)(A)(v); 1182(a)(3)(B)(iv)(VI), (vi)(III).

On appeal, FH-T advances a nuanced argument challenging the Board's conclusion that he does not qualify for the knowledge exemption to the material support bar: He argues that he has consistently claimed ignorance of any *unlawful* activity committed by the EPLF, while simultaneously acknowledging his awareness of "lawful" violence undertaken by the EPLF as part of a

---

[2] Unlike Tiers I and II, the Government does not maintain a formal list of organizations falling under Tier III.

struggle for independence. Accordingly, Petitioner does not dispute that he was aware of the fighting between Eritrean and Ethiopian forces during the war, but contends that he understood the EPLF to be operating as a pseudo-government engaged in a legitimate war of independence. Nevertheless, he claims that he has consistently denied having any knowledge of any *unlawful* (terrorist) activities, such as attacks on civilians committed by the EPLF during the time he was affiliated with the group. His ignorance of such unlawful violence, FH-T continues, is corroborated by a letter from his friend and the testimony of Eritrean country expert Trisha Hepner, who explained that a high level of secrecy was associated with the EPLF's military actions and combat strategy.

Petitioner argues that the Board's opinion glossed over the significant distinction between his knowledge of the EPLF's lawful violent activities as compared to its unlawful ones, and its failure to adequately address such a critical component of his claim is grounds for a remand. *Champion v. Holder*, 626 F.3d 952, 957 (7th Cir. 2012) ("Finding that the BIA erred by failing to consider the impact of Yomi's potential deportation, we remand this matter in order for the BIA to address this critical component of the hardship analysis."). Further, as a matter of policy, Petitioner contends that Congress did not intend to impose "strict liability" on asylum-seekers so as to render them ineligible for asylum on the basis of any support for armed independence movements against dictatorial regimes. In advancing this argument, Petitioner urges that wars of independence are lawful

under international law, Eritrean law, and the laws of the United States.

The language of the statute suggests that the relevant analysis for purposes of the knowledge exemption is whether the activity of which FH-T was aware is "unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States)." 8 U.S.C. § 1182(a)(3)(B)(iii). While acknowledging that it is an open question whether a court ought to examine the law of the newly independent nation or the laws of the oppressor nation (in assessing an action's lawfulness "under the laws of the place where it is committed"), Petitioner submits that Eritrea is the relevant "law of the place" for purposes of the inquiry surrounding the legality of the EPLF's activity. The Eritrean Constitution, Petitioner suggests, unsurprisingly recognizes the EPLF's wartime activities as lawful. *See* Eri. Const. pmbl. (expressing "[e]ternal [g]ratitude to the scores of thousands of our martyrs who sacrificed their lives for the causes of our rights and independence, during the long and heroic revolutionary struggle for liberation.").[3]

---

[3]  In addition, Petitioner argues that even if Ethiopia is the "law of the place" for purposes of the knowledge exemption to the material support bar, it "is not clear that the EPLF's actions would be considered unlawful *in se*." (Petitioner's Br. at 21). Ethiopia's most recent constitution (relevant because the language of the statute is in the present tense, *see* 8 U.S.C. § 1182(a)(3)(B)(iii)), states that "[e]very Nation, Nationality

(continued...)

Further, Petitioner argues that the EPLF activities of which he was aware do not violate United States law. To this end, FH-T concedes that "it violates the law to conspire or aim to overthrow the government of the United States," 18 U.S.C. §§ 2384, 2385, but argues that this comparison is an improper analogue. Instead, Petitioner urges us to imagine a foreign oppressor operating a non-democratic government, noting that our domestic law did not bar our own independence movement against Britain. FH-T also refers us to the Guarantee Clause, U.S. Const., Art. IV, § 4, which promises a republican form of government and requires the federal government to protect against invasion and domestic violence. *Id.* Amicus adds that congressional intent, as expressed via the Immigration and Nationality Act's broad definition of refugees, *see* 8 U.S.C. § 1101(a)(42), is at odds with the notion of excluding a large swath of asylum-seekers on the basis of their involvement with an independence movement.[4]

---

[3] (...continued)

and People in Ethiopia has an unconditional right to self-determination, including the right to secession." Eth. Const. art. 39, pt. 1 (1995).

[4] Other courts have encountered various versions of this argument. The Ninth Circuit, for instance, has explained that "there may be an exception to the definition of 'terrorist activity' where 'the law of the country in question incorporates international law such that the conduct in question is no longer 'unlawful' under the country's domestic law.'"

(continued...)

We need not decide whether the violent activity Petitioner knew about was lawful in the place where it was committed or would be lawful in the United States, however, because FH-T did not exhaust this "lawful violence" argument before the Board. We have explained that "an alien must exhaust 'all administrative remedies available to the alien as of right,' . . . and this includes the obligation first to present to the Board any arguments that lie within its power to address." *Issaq v. Holder*, 617 F.3d 962, 968 (7th Cir. 2010) (citing 8 U.S.C. § 1252(d)(1)) (other

---

[4] (...continued)

*Annachamy v. Holder*, 686 F.3d 729, 734 n.4 (9th Cir. 2012) (citing *Khan v. Holder*, 584 F.3d 773, 781 (9th Cir. 2009)). Because the petitioner in *Annachamy* failed to provide "any evidence that Sri Lanka has incorporated such international law," the Ninth Circuit declined the petitioner's invitation to remand. *Id.*; see also Khan, 584 F.3d at 781 ("An action would be lawful within the meaning of § 1182(a)(3)(B)(iii) if the law of the country in question incorporates international law such that the conduct in question is no longer 'unlawful' under the country's domestic law, but Khan has made no argument that that is the case here."); *cf. McAllister v. Att'y Gen.*, 444 F.3d 178, 187 (3d Cir. 2006). In the present case, while Petitioner argues on appeal that international law recognizes that the use of force during hostilities in wars of independence can be lawful, like the unsuccessful petitioner in *Annachamy*, he has not articulated a claim that Eritrea has *incorporated* such international law authorizing the use of force in independence movements. Regardless, for the reasons stated, FH-T did not exhaust this claim before the Board and his argument cannot succeed.

citation omitted). This rule is not jurisdictional, but rather is a "case-processing rule that limits the arguments available to an alien in this court when those arguments have not been raised properly at the agency level." *Id.* The exhaustion requirement is meant to provide "the Board an opportunity to apply its specialized knowledge and experience to the matter" as well as "provide[] the petitioner with the relief requested in the first instance, and . . . provides us with reasoning to review." *Arobelidze v. Holder*, 653 F.3d 513, 517 (7th Cir. 2011).

In his brief before the Board, Petitioner argued that "[i]n presuming that [Petitioner] must have known about the full scope of activities of the EPLF, the Immigration Judge ignored" expert testimony and the letter from FH-T's friend. Petitioner's appeal before the Board further argued "[t]he Immigration Judge also erroneously concluded that [Petitioner] knew or should reasonably have known that EPLF was a terrorist organization." The government contends that such arguments before the Board were aimed at persuading it that FH-T was *altogether* ignorant of the EPLF's activities, not that he possessed innocuous as opposed to inculpating knowledge. Indeed, FH-T did not use the "lawful" versus "unlawful" activity terminology before the Board, did not discuss the laws of the places where the EPLF's violence was carried out or United States law, and did not cite the definition of "terrorist activity" contained in § 1182(a)(3)(B)(iii).

We agree with the government that FH-T did not exhaust this argument before the Board. The fact that the

argument FH-T advanced before the Board appears *consistent* with his claim on appeal that he was aware of the (possibly) lawful violence committed by the EPLF but simultaneously ignorant of its unlawful activities is not enough for purposes of exhaustion: it is not the Board's responsibility to divine and respond to theories that are unformed and lacking in citation to supporting authority. *See El-Gazawy v. Holder*, 690 F.3d 852, 858-59 (7th Cir. 2012) (unformed arguments before the Board were "simply too thin for the BIA to recognize [ ] in the form the petitioner now urges us to consider."). On appeal Petitioner claims that "[b]y focusing broadly on whether Petitioner knew of any violence committed by the EPLF rather than any *unlawful* violence, the Board's analysis asked the wrong question and reached the wrong conclusion." (Petitioner's Br. at 12). The government rightfully points out that this framework turns the exhaustion requirement on its head: the burden is affirmatively on the petitioner, not the Board, to present "arguments that lie within its power to address." *Issaq*, 617 F.3d at 968. Petitioner's arguments before the Board were insufficient to provide notice of the "lawful violence" theory he advances on appeal. Had Petitioner employed the lawful-versus-unlawful terminology below, cited the definition of terrorist activity in § 1182(a)(3)(B)(iii), or elucidated arguments that the types of force used by the EPLF of which Petitioner had knowledge are lawful under Eritrean or American law, our finding may well have been different. Indeed, in its brief the government does not dispute that the text of the relevant statutory scheme requires knowledge of

*unlawful* violence for purposes of the material support bar's knowledge exemption in the context of a Tier III terrorist organization.[5] *See* Appellee's Br. at 26. But FH-T's failure to articulate this novel argument before the Board requires us to find that he did not exhaust it, and his claim that he falls under the knowledge exemption to the material support bar must therefore fail. We need not reach the government's alternative claim that the Board and Immigration Judge clearly found that FH-T failed to disprove his awareness of EPLF's attacks on civilians (even assuming that the EPLF attacks on the Ethiopian military do not qualify as terrorist activity).

### B. Whether the Petition Must be Granted Because Current Government Procedures for Adjudicating Material Support for Terrorism Waivers are Legally Flawed

Petitioner next argues that even assuming his activities triggered the material support bar, the denial of asylum and the entry of a removal order were nevertheless er- roneous because the Board's decision deprived him of a

---

[5] Instead, the government noted, without analysis, that two federal courts of appeals rejected versions of the argument FH-T now advances on appeal. (Government's Br. at 27). The gov- ernment did not address the argument on its terms, instead relying upon exhaustion as well as an argument that "the Board's ruling that FH-T failed to prove he did not know, or should not reasonably have known of EPLF's terrorism of civilians is independently dispositive." *Id.*

fair opportunity to obtain a waiver from that bar. The
Secretary of State and Secretary of Homeland Security may,
in consultation with one another and the Attorney
General, waive the application of the material sup-
port bar for individual aliens or groups. 8 U.S.C.
§ 1182(d)(3)(B)(i). The legislative history surrounding
the availability of such waivers or exemptions, which
are rarely issued, suggests that Congress was concerned
that the breadth of the definition of "terrorism" as con-
tained in the bars might sweep too broadly, effectively
denying asylum to otherwise deserving applicants.
*See* "The 'Material Support' Bar: Denying refuge to the
Persecuted," S. Hrg. 110-753, 7 (Sept. 19, 2007). In
addition, when Congress last amended the exemption
process, it added language indicating that waiver deci-
sions shall be subject to judicial review under
§ 1252(A)(2)(D).[6] The Consolidated Appropriations Act
2008, Pub. L. No. 110-161, Div. J, § 691, 121 Stat. 1844, 2364-
66 (Dec. 26, 2007).

FH-T contends that published DHS policy suggests
that the Department will not consider whether to grant a
waiver until: (1) the petitioner was found eligible for
asylum "but for" the material support for terrorism bar;
and (2) the petitioner has received a final order denying

---

[6] The amended language provides that "no court shall have
jurisdiction to review such a determination or revocation
except in a proceeding for review of a final order of removal
pursuant to section 1252 of this title and review shall be
limited to the extent provided in section 1252(a)(2)(D)."
8 U.S.C. § 1182(d)(3)(B)(i).

him asylum (and thus ordering removal). It is undisputed that the Board is required to promptly proceed with an asylum case and cannot hold it indefinitely in abeyance while awaiting waiver adjudication by DHS. *See* 8 C.F.R. 1003.1(e)(8) (requiring the Board, with certain exceptions, to adjudicate cases within 90 days (for single-member boards) or 180 days (for three-member panels)).

FH-T argues that this procedure is legally flawed as applied to this case in two respects: (1) the Board erred in its adjudication by not addressing whether FH-T would be eligible for asylum "but for" the material support for terrorism bar, despite the fact that an exemption possibility existed; and (2) the Board erred in ordering removal and denying asylum before DHS adjudicated the exemption matter, effectively preventing judicial review of any waiver determination in the context of a final removal order, as authorized in 8 U.S.C. § 1182(d)(3)(B)(i).

### (i) The Board's Decision Not to Adjudicate the Merits of Petitioner's Claim

Petitioner first argues that because published DHS policy requires that a petitioner be eligible for asylum "but for" the material support bar in order to be considered for a waiver, it was erroneous for the Board to dismiss Petitioner's asylum claim without addressing the merits. The Board explained that "[t]o the extent that the respondent has argued his possible eligibility for a waiver under section 212(d)(3)(B)(i) of the Act, we

note that the Secretary of State has the sole authority to grant this waiver, and this provision does not affect the disposition of the instant removal proceedings," (Supplementary Appendix at 3, n. 1) (hereafter "SA"), effectively acknowledging the existence of such a waiver but recognizing its lack of authority to decide the issue.

As previously mentioned, 8 U.S.C. § 1182(d)(3)(B)(i) empowers the Secretary of State and Secretary of Homeland Security, in consultation with one another and the Attorney General, to waive the application of the material support bar for individual aliens or groups. It further provides that no court shall have jurisdiction "to review such a determination" except in a proceeding for review of a final removal order. *Id.* According to a "Fact Sheet" published by DHS regarding such waivers, a threshold requirement for obtaining a waiver is that an applicant "is seeking a benefit or protection under the Act *and has been determined to be otherwise eligible* for the benefit or protection." (SA at 46) (emphasis added). The Fact Sheet explains that an asylum petition will only be given exemption consideration "if relief or protection was denied solely on the basis of one of the grounds of inadmissibility for which exemption authority has been exercised by the Secretary." (SA at 49). FH-T argues that because the Board halted its analysis upon determining that the material support bar had been triggered and declined to adjudicate the merits,[7] Petitioner

---

[7] The Board explained "[a]s the respondent is barred from receiving asylum and withholding of removal, we need not

(continued...)

was necessarily denied the opportunity to seek a waiver from DHS, as the statute permits.

Petitioner argues that the precarious position he occupies—unable to seek a waiver because no final finding of asylum eligibility "but for the bar" has been issued, and unable to receive a full adjudication of asylum eligibility on the basis that he is subject to the material support bar—has been rejected by the Seventh Circuit. He claims that our case law requires coordination among agencies with overlapping authority, as between the Board and DHS or between the Board and the Department of State, and that the Board's decision not to fully address the merits of his claim constituted an abdication of its role. (Petitioner's Br. at 37 ("[T]he Board abdicated its consultative role by not only not making a recommendation, but by issuing a decision which hinders DHS from making any exemption decision in the case.").)

In support of this claim, FH-T cites a line of cases which he argues stands for the proposition that a minimum level of coordination among the various executive agencies is required and supports our jurisdiction here. *See Siddiqui v. Holder*, 670 F.3d 736, 741 (7th Cir. 2012); *Ceta v. Mukasey*, 535 F.3d 639, 646-47 (7th Cir. 2008) ("unless [] subagencies engage in some minimal co-

---

[7] (...continued)

address the other arguments on appeal regarding the merits of the respondent's claim of persecution in Eritrea on account of actual or imputed political opinion." *(SA at 3).*

ordination of their respective proceedings—for example, by the immigration courts favorably exercising discretion, in the appropriate case, to continue proceedings to allow the other subagency to act—the statutory opportunity to seek [relief] will prove to be a mere illusion."); *Potdar v. Keisler*, 505 F.3d 680, 684 (7th Cir. 2007), *vacated on other grounds by Potdar v. Keisler*, 550 F.3d 594 (7th Cir. 2008); *Boyanivskyy v. Gonzales*, 450 F.3d 286, 292 (7th Cir. 2006); *Benslimane v. Gonzalez*, 430 F.3d 828, 832 (7th Cir. 2005); *Subhan v. Ashcroft*, 383 F.3d 591, 595 (7th Cir. 2004). FH-T suggests that because the Board's adjudication practices operate to "nullify a statutory right" and effectively thwart Congress's desire to provide aliens subject to terrorism bars with an exemption possibility, we are authorized to review such procedures and instruct the Board to adjudicate Petitioner's claim in a particular way.

In *Ceta*, we provided a helpful discussion of the reasoning behind the line of cases upon which Petitioner relies:

> In *Subhan*, we concluded that, despite the door-closing statute, we had jurisdiction to review the denial of a continuance when such a denial would nullify an alien's statutory opportunity to adjust status. Specifically, we found it untenable "that Congress, intending, as it clearly did, to entitle illegal aliens to seek an adjustment of status upon the receipt of [certain required] certificates . . ., at the same time also intended section 1252(a)(2)(B)(ii) to place beyond judicial review decisions that nullif[y] the statute."

> *Subhan*, 383 F.3d at 595. In *Benslimane v. Gonzales*, we explained that *Subhan* applies when the denial of a continuance request has "the effect of a substantive ruling on the application to adjust . . . status." 430 F.3d 828, 832 (7th Cir. 2005) ("An immigration judge cannot be permitted, by arbitrarily denying a motion for a continuance without which the alien cannot establish a ground on which Congress has determined that he is eligible to seek to remain in this country, 8 U.S.C. §§ 1151(b)(2)(A)(i), 1255(a), to thwart the congressional design.").

535 F.3d at 645-46. These cases did not concern a purported right to a waiver determination in the context of the material support for terrorism bar, but rather statutory rights to apply for adjustment of status (*Ceta*, *Subhan*, *Benslimane*), or to present evidence in a removal hearing (*Boyanivskyy*), or to seek "legalization" (*Potdar*, *Siddiqui*). Nevertheless, Petitioner argues that these cases stand for the general principle that we must instruct the Board to adjudicate the merits of his claim.

The government counters that we lack jurisdiction to review the Board's case adjudication practices and argues that the cases Petitioner cites are distinguishable from the present one because they concerned "statutory rights," whereas the waiver provision at issue here confers no such rights.[8] The government claims that "[n]othing

---

[8] The government also claims that Petitioner failed to exhaust the argument below that the Board was required to adjudicate

(continued...)

in the exemption provision establishes a right in any alien to apply for an exemption, or any right, entitlement, or interest in the exemption possibility itself." (Government's Br. at 38).

It is true that the language of the statutes permitting an individual to vindicate adjustment of status or legalization rights invites individuals to "apply," *see* 8 U.S.C. § 1255(a) (describing the alien's ability to "make[] an application for such adjustment"), whereas the language of the waiver provision at issue here does not, instead simply empowering the Secretaries with "sole unreviewable discretion" to grant a waiver, 8 U.S.C. § 1182(d)(3)(B)(i).[9] Indeed, the Secretary of DHS herself has apparently advanced this understanding, declaring that her exercise of the provision's authority is "not

--------

(...continued)

the merits of his argument. This view of exhaustion is too demanding. In his brief before the Board, Petitioner explicitly acknowledged the while the grant of the discretionary waiver is outside the authority of the Board or the Immigration Judge to issue directly, the Board should nevertheless "consider all his arguments on appeal even if the Board upholds the material support bar" so that his ability to obtain other administrative remedies is not frustrated. (Administrative Record at 24). Indeed, the Board discussed the issue in its decision, (SA at 6), further indicating that the argument was appropriately exhausted.

[9] The provision also enumerates bars to the extension of that relief and the right to judicial review. 8 U.S.C. § 1182(d)(3)(B)(i).

intended to create any substantive or procedural right or benefit that is legally enforceable by any party." (SA at 46). The government further notes that Petitioner's case is distinguishable from the *Ceta* line in a procedural sense: FH-T has not sought a continuance or the approval of an application for a benefit, but instead seeks "the equivalent of a pardon" to remove the material support for terrorism designation.

Thus, at least as a matter of text, the exemption provision before us is technically distinct from the rights at issue in the *Ceta* line of cases. Denying Petitioner relief on this basis is somewhat troubling, as, in a broader sense this case is much like the other cases in which we expect the immigration courts to coordinate action with other executive agencies so as to avoid depriving individuals of opportunities to which they are legislatively entitled. Moreover, the Secretary of DHS's characterization of the exemption provision is unsatisfying: The suggestion that her exercise of the provision's authority is not "legally enforceable" is at least in some sense belied by Congress's explicit authorization of judicial review of waiver determinations.

Nevertheless, we are of the opinion that the present case does not fall within the *Ceta* line. In addition to the textual distinctions (no part of the present statute affords a petitioner the opportunity to "apply" for an exemption) and procedural disparities (FH-T did not request a continuance), pragmatic considerations counsel in favor of abstaining from encroachment upon agency expertise in this context. As compared to the

adjustment of status or legalization applications, exemp-
tion grants from the terrorism bars are exceedingly rare.
Accordingly, while there are sound practical consider-
ations weighing in favor of requiring a floor of inter-
agency coordination in the context of the (relatively)
frequently granted status adjustments or legalization
applications, a decree requiring a specific method of
Board adjudication in every case in which a petitioner
holds himself out as eligible for a waiver to the
terrorism bars may serve only to prolong the resolution
of cases in an already strained system. While it may be
optimal in theory for the Board to adjudicate all asylum
cases in a manner that furnishes DHS with every poten-
tially useful determination to inform its consideration
of exemptions, we cannot conclude that the *Ceta* line
of cases compels as much. Indeed, instructing the Board
to adjudicate all asylum cases implicating the material
support for terrorism bar in the manner prescribed by
Petitioner would be far more intrusive than any of our
past mandates (such as instructing the Board to issue
continuances) on the basis of a far less certain statutory
right, if such a right exists at all.[10]

---

[10] Although the present case does not fall within the *Ceta* line,
this does not mean, as the government suggests, that we lack
jurisdiction to review the procedural sufficiency of the Board's
actions. The government argues that "[w]here neither the
statute, regulations, nor the Constitution afford FH-T a right
or entitlement to apply or be considered for a terrorism
waiver, FH-T necessarily also lacks any ground upon which to

(continued...)

It's worth noting that if Petitioner's interpretation of the DHS Fact Sheet is in fact accurate, he is rightfully frustrated that by declining to reach the question of whether he would be eligible for asylum "but for" the bar, the Board effectively deprived him of the opportunity to plausibly seek a waiver from DHS. However, it's not clear that FH-T's interpretation of the Fact Sheet is correct, or that the Fact Sheet is in any sense binding upon the Board or DHS. For instance, the government points out that the Fact Sheet requires only that "[a]ll

---

[10] (...continued)

assert that the jurisdictional clause in § 1182(d)(3)(B)(i)—providing jurisdiction to review an exemption 'determination,'—pertains to anything other than the exemption 'determination' he has not obtained." (Government's Br. at 41-42). However, we have said that "[t]he procedural sufficiency of an immigration hearing is a legal question," *Boyanivskyy*, 450 F.3d at 291, and thus we properly consider the Board's actions de novo. *Id.* Indeed, if we were to have concluded that the current agency process "thwart[s] the congressional design," *Benslimane*, 430 F.3d at 832, we would be within our authority in remanding the case to the Board for a full determination as to whether Petitioner would be eligible for asylum but for the bar. *See id.* at 833("We are not required to permit Benslimane to be ground to bits in the bureaucratic mill against the will of Congress."); *see also Lagunas-Salgado v. Holder*, 584 F.3d 707, 713 (7th Cir. 2009) (the immigration statute guarantees a fair hearing); *Ceta*, 535 F.3d at 645 ("In *Subhan,* we concluded that, despite the door-closing statute, we had jurisdiction to review the denial of a continuance when such a denial would nullify an alien's statutory opportunity to adjust status.").

parties . . . have a chance to litigate the merits of the case up through the BIA," (SA at 49); it does not explicitly require the Board to adjudicate the merits in any particular fashion. Perhaps more significantly, it is not clear from the language of the Fact Sheet that the Board alone possesses the ability to determine whether an alien would be "otherwise eligible for the benefit or protection." The Fact Sheet's use of the passive voice (the exemption provision applies to an alien "seeking a benefit or protection . . . and *has been* determined to be otherwise eligible for the benefit or protection.") (SA at 47) (emphasis added), suggests that other officials or agencies, perhaps including DHS itself, could theoretically determine that an alien would be "otherwise eligible" for relief. (*See* Government's Br. at 56 n. 15). If that were the case, the Board's decision not to adjudicate the merits of Petitioner's asylum claim would not deprive him of the opportunity to be considered for a waiver.

Ultimately, the alleged statutory right to consideration for an exemption is simply too nebulous for us to require, at this stage, that the Board adjudicate such claims in the particular manner Petitioner requests. FH-T does not point us to compelling evidence that Congress, rather than a single non-binding agency publication, intended the waiver provision to require Board adjudication of the merits of asylum claims in every case triggering the material support for terrorism bar. While Petitioner alerts us to a disconcerting lack of harmonization among executive agencies, we cannot say that the Board "legally erred" in declining to reach the merits of FH-T's asylum claim.

### (ii) The Board's Issuance of a Final Removal Order Prior to a DHS Exemption Decision

Petitioner next argues that the existing waiver process is flawed because the entry of a removal order by the Board *prior* to any waiver adjudication by DHS either frustrates judicial review or requires the federal courts to expand their jurisdiction beyond determinations normally treated as removal orders.[11] As previously mentioned, Congress expressly provided for federal judicial review over exemption determinations under the limited jurisdictional provisions of 8 U.S.C. § 1252(a)(2)(D) and 8 U.S.C. § 1182 (d)(3)(B)(i). Congress further specified

---

[11] The government argues that FH-T's challenge regarding the timing of waiver determinations presents a non-justiciable political question. We disagree. The Supreme Court recently explained that "[t]he Judicial Branch appropriately exercises [ ] authority . . . where the question is whether Congress or the Executive is 'aggrandizing its power at the expense of another branch.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S.Ct. 1421, 1428 (2012) (quoting *Freytag v. Commissioner*, 501 U.S. 868, 878 (1991)). FH-T's claim can properly be characterized as an argument that the Executive's current adjudication procedures amount to an aggrandizement of its power at the expense of statutorily-enacted relief (the possibility of a waiver and judicial review thereof) explicitly provided for by Congress. Further, we have repeatedly found judicially manageable standards in determining whether executive agency actions have the effect of nullifying immigration statutes. *See Potdar*, 550 F.3d at 596-97, *Ceta*, 535 F.3d at 645, *Benslimane*, 430 F.3d at 832; *Subhan*, 383 F.3d at 591. Petitioner's claim is justiciable.

that such review must occur in the context of a petition for review from a final removal order. 8 U.S.C. § 1182 (d)(3)(B)(i). Under current DHS procedures, DHS considers whether to grant a waiver only *after* a final removal order is entered. Meanwhile, the removal order entered by the Board triggers a 30-day window for the asylum applicant to seek federal judicial review. 8 U.S.C. § 1252(b)(1). The DHS waiver process and the removal order review process are wholly independent; in the typical case (such as the present one), a petitioner will have no waiver determination upon which to seek review as part of his final removal order within the 30-day window. Petitioner concedes that it is unlikely that Congress intended DHS waiver decisions *themselves* to constitute separately reviewable decisions analogous to removal orders, as this would result in twice as many appeals to this court, raising costs and straining judicial resources. (Petitioner's Br. at 41). Thus, the parallel track scheme as it currently operates may frustrate Congress's conferral of exemption review authority upon the courts. Accordingly, FH-T claims "the more natural reading of the statute is to require that exemption decisions be made *before* a final removal order, not afterward." (Petitioner's Br. at 37) (emphasis in original). Petitioner suggests that as an alternative to the present system, "[t]he Board might, for instance, communicate its decision to the parties, but withhold finality from the order until DHS could make a decision on the exemption possibility." (Petitioner's Br. at 41). At bottom, Petitioner argues that the process by which DHS and the Board currently coordinate waivers

of terrorism-related inadmissibility bars should be deemed unlawful.

Congress has enacted legislation addressing this sort of problem in other contexts. For example, in the context of 8 U.S.C. § 1255a(f)(4), which authorizes judicial review of legalization denials (but likewise only in the context of a petition for review from a final removal order), Congress automatically stayed removal for individuals presenting prima facie legalization claims. 8 U.S.C. § 1255a(e)(2); *see also* 8 U.S.C. § 1160(d)(2) (same, for applicants under farm worker program). Legalization decisions, like material support bar waiver decisions, are made by DHS and are not reviewable by the Board of Immigration Appeals. 8 U.S.C. § 1255a(f)(3)(A); *Matter of Singh*, 21 I&N Dec. 427 (BIA 1996).

Because Congress has not similarly authorized automatic stays for DHS material support for terrorism waiver decisions pending review, Petitioner suggests that the Board should abstain from issuing a final removal order until after DHS issues an exemption determination, such that the determination could be reviewed naturally in the course of an appeal from the removal order itself. This approach, he argues, would facilitate appeal to this court (should it become necessary), vindicating the judicial review explicitly provided for by Congress, while limiting the proliferation of multiple claims by the same petitioner.

The government urges that adopting Petitioner's argument would "turn the statute on its head to interpret it as requiring the Secretaries to afford an alien the oppor-

tunity to apply for a terrorism waiver in order to vindicate a right to judicial review of that waiver." (Government's Br. at 42). The government reads the statute as guaranteeing no such right, but rather merely identifying where (on petition for review of a removal order) and when (after a determination or revocation) judicial review may occur, assuming such a determination takes place. *See* 8 U.S.C. § 1182(d)(3)(B)(i). Because no such procedural interest is promised by the statute, the government continues, the judicial review clause itself cannot "force the Executive" to provide a determination.

As a textual matter, the government is correct. *See id.* And Petitioner provides no persuasive support for the suggestion that it is within our authority to order the DHS and the Board to coordinate adjudication in this fashion so that asylum applicants are not ordered removed before a waiver determination has been made. The government's interpretation is of some concern, however, insofar as Congress did clearly legislate to provide for judicial review of DHS waiver determinations, and current agency practices will in all likelihood frustrate the opportunity for review because Board decisions will issue more quickly than DHS exemptions (and the period for appealing a removal order will otherwise lapse).

Nevertheless, the comparatively comprehensive scheme in place for *per se* stays in the context of legalization decisions illustrates the fact that Congress knows how to solve this predicament when it so chooses. To instruct the Board to automatically stall the issuance of

its opinions (including in cases such as the present one where the petitioner has not requested a continuance) while awaiting exemption determinations from DHS which may or may not *ever* issue would not only grind the levers of the immigration system to a near halt, but would constitute an impermissible judicial encroachment upon agency authority. While Petitioner again alerts us to the troubling operation of uncoordinated procedures; we again hold that it is the province of Congress, rather than the courts, to mend this bifurcated scheme. We decline Petitioner's invitation to reverse on this basis.


## IV.  Conclusion

For the foregoing reasons, we DENY the petition.